UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

RICHARDS CONDITIONING CORP.,

*Debtor.*

Case *No.* 09-22525 *(rdd)*

White Plains, New York
July 8, 2010
10:14 a.m.

TRANSCRIPT OF CHAP 11 HEARING RE: DOC. 254 - OBJECTION
TO MOTION APPLICATION FOR 2004 EXAMINATION FILED BY
PARSHHUERAM T. MISIR ON BEHALF OF F.W. SIMS INC.;
RE: DOC. 271 - SUPPLEMENTAL OBJECTION TO MOTION BY
F.J. SCIAME CONSTRUCTION CO., INC. (SCIAME) TO DEBTORS
APPLICATION, PURSUANT TO BANKRUPTCY RULE 2004 FOR ORDER
DIRECTING EXAMINATION OF SCIAME AND PRODUCTION OF DOCUMENTS;
(II) OBJECTION TO DEBTORS APPLICATION;
RE DOC. 243 - EX PARTE APPLICATION FOR FRBP 2004
EXAMINATION OF THE COOPER UNION FOR THE
ADVANCEMENT OF SCIENCE AND ART FILED BY ANNE J. PENACHIO
ON BEHALF OF RICHARDS CONDITIONING CORP.;
RE: DOC. 175 - OBJECTION TO MOTION DEBTOR'S APPLICATION,
PURSUANT TO BANKRUPTCY RULE 2004, FOR ORDER DIRECTING THE
EXAMINATION OF F.J. SCIAME CONSTRUCTION CO., INC.
FILED BY DAVID H. WANDER ON BEHALF OF
F.J. SCIAME CONSTRUCTION CO., INC.;
RE: DOC. 236 - NOTICE OF PRESENTMENT OF ORDER AUTHORIZING
2004 EXAM ON F.W. SIMS FILED BY ANNE I. PENACHIO ON
BEHALF OF RICHARDS CONDITIONING CORP.;
RE: DOC. 151 - APPLICATION FOR FRBP 2004 EXAMINATION FILED BY
ANNE J. PENACHIO ON BEHALF OF RICHARDS CONDITIONING CORP.;
RE: DOC. 245 - LETTER TO JUDGE DRAIN RE DEBTOR'S APPLICATION
FOR RULE 2004 EXAMINATION OF THE COOPER UNION FOR THE
ADVANCEMENT OF SCIENCE AND ART FILED BY DAVID H. WANDER ON
BEHALF OF F.J. SCIAME CONSTRUCTION CO., INC.
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

```
                    UNITED STATES BANKRUPTCY COURT
 1                  SOUTHERN DISTRICT OF NEW YORK

 2

 3   A P P E A R A N C E S :

 4
     For the Debtors:          ANNE PENACHIO, ESQ.
 5                             Penachio Malara, LLP
                               235 Main Street, Suite 600A
 6                             White Plains, New York 10601-2418
                               (914) 946-2889
 7

 8   For BHMRH:                SCOTT A. STEINBERG, ESQ.
                               Rattet, Pasternak & Gordon-Oliver, LLP
 9                             550 Mamroneck Avenue
                               Harrison, New York 10528
10                             (914) 381-7400; (914) 381-7406 fax

11

12   For FJ Sciame:            DAVID H. WANDER, ESQ.
                               Davidoff Malito &Hutcher, LLP
13                             605 Third Avenue
                               New York, New York 10158
14                             (212) 557-7200; (212) 286-1884 fax

15

16   For FW Sims:             JOHN M. COMISKEY, ESQ.
                               Agovino & Asselta, LLP
17                             170 Old Country Road, Suite 608
                               Mineola, New York 11501
18                             (516) 248-9880; (516) 248-9879 fax

19
     Transcription Service:    A-1 Transcripts
20                             (877) 777-5133; (800) 860-5722 fax
                               A1@court-transcripts.net
21

22       Proceedings recorded by electronic sound recording.
             Transcript produced by transcription service.
23

24

25
```

*In re Richards Conditioning Corp. - 7/8/10*                3

1      THE COURT:  Richards Conditioning.  Okay.  This is the

2   -- well there are two of them; the debtor's motions for Rule

3   2004 examinations and document production.

4      MS. PENACHIO:  Your Honor, there are three outstanding

5   2004 applications; one is for the F.J. Sciame Company, the other

6   is for F.W. Sims and the third is for the Cooper Union.

7      Your Honor, the debtor -- I believe that these are

8   generic plain vanilla 2004 applications.  The debtor requires

9   discovery from these entities for several reasons, primarily to

10  ascertain claims that the estate may hold against any entities

11  for recovery for either overpayments or for breach of contract

12  claims.  The debtor also requires discovery to ascertain what

13  trust fund claimants have been paid.  And the debtor

14  respectfully requests that the motion be granted.

15     THE COURT:  Okay.  The Sims one, there's an objection

16  on the basis that there are no 3(a) lien law issues implicated

17  by the Sims relationship to the debtor.

18     MS. PENACHIO:  Your Honor, that may be so.  The

19  primary reason for the 2004 over Sims is that the debtor

20  believes that Sims was overpaid.  Pursuant to --

21     THE COURT:  Overpaid by the debtor?

22     MS. PENACHIO:  Overpaid by the debtor.  Pursuant to

23  the debtor's contract with Sims, the debtor was required to pay

24  a premium to Sims' workers, union workers the premium range from

25  $8.50 an hour to over thirteen dollars an hour.  The debtor has

*In re Richards Conditioning Corp. - 7/8/10*                    4

1   reason to believe that that premium was not -- did not trickle

2   down to the hourly wage employees as it was supposed to under

3   the contract.  That's Sims' essentially kept that money as

4   profit.  And that's set forth in my application and it wasn't

5   addressed in the opposition.

6          THE COURT:  Okay.

7          MS. PENACHIO:  And there may be a valid fraudulent

8   conveyance claim that the debtor has against Sims.

9          THE COURT:  Was that money earmarked for the workers?

10         MS. PENACHIO:  Yes, Your Honor, it was.  May I just

11  confirm that with Mr. Hopwood?

12         THE COURT:  Yes.

13         MS. PENACHIO:  Yes, it was.  Yes.

14         THE COURT:  Okay.

15         MS. PENACHIO:  And it's set forth in my application.

16         THE COURT:  And were those -- I'm sorry, were those

17  the debtor's workers or Sims' workers?

18         MS. PENACHIO:  Those were Sims' workers.

19         THE COURT:  But I guess your potential rationale is

20  that the debtor was prepared to agree to that on the basis that

21  the workers demanded it or that was really a cost as opposed to

22  a profit?

23         MS. PENACHIO:  Yes, Your Honor, and under Article 3(a)

24  that cost should have been allocated to other material men and

25  tradesmen if it didn't go to the workers who worked on the job.

*In re Richards Conditioning Corp. - 7/8/10*                    5

1        THE COURT:  As opposed to profit.

2        MS. PENACHIO:  Correct.

3        THE COURT:  And those 3(a) people may have been people

4   that you also -- your client also would owe money to?

5        MS. PENACHIO:  Yes.

6        THE COURT:  Okay.  All right.

7        MS. PENACHIO:  So Sims got more than it should have.

8        THE COURT:  Well that's what you want to look into.

9        MS. PENACHIO:  Yes, yes.

10       THE COURT:  All right.

11       MS. PENACHIO:  Correct.

12       THE COURT:  Okay.

13       MS. PENACHIO:  And I believe that --

14       THE COURT:  I didn't see any opposition on the Cooper

15  Union one.  Have you received any?

16       MS. PENACHIO:  Mr. Wander did oppose Cooper Union.

17       THE COURT:  Okay.  You haven't received any from

18  Cooper Union itself?

19       MS. PENACHIO:  I have not, Your Honor.

20       THE COURT:  Okay.

21       MR. WANDER:  Your Honor, in my opposition papers, I

22  had a statement that we were also filing on behalf of Cooper

23  Union.

24       Your Honor, the court reporter has lifted up his sign.

25  So I would just like to note that it's David Wander of Davidoff

*In re Richards Conditioning Corp. - 7/8/10*                6

1   Malito & Hutcher.

2         But if Your Honor wants to finish first with the Sims

3   application and then go to Cooper Union and Sciame, we can do

4   that.

5         THE COURT:  Well first I don't -- well let me deal

6   with Cooper Union.  I have -- okay.  I know that your client

7   which is Sciame filed a supplemental objection to the Sims and

8   Cooper Union 2004 examination request but you weren't doing that

9   on behalf of Cooper Union, were you?  Were you authorized to do

10  it on their behalf?

11        MR. WANDER:  Yes, Your Honor.  We have specifically

12  been authorized to do it on their behalf.  And in my footnote,

13  number one, it states Sciame has been authorized by Cooper Union

14  to also file this objection on its behalf --

15        THE COURT:  All right.

16        MR. WANDER:  -- in lieu of Cooper Union filing a

17  separate objection.

18        THE COURT:  All right.  Fine.  So why don't we turn to

19  the objections then.

20        MR. WANDER:  Yes, Your Honor.  Your Honor --

21        THE COURT:  Why don't we deal with Sims' objection to

22  the 2004 of Sims first and then we'll deal with Sciame's

23  objections to all three.

24        MR. COMISKEY:  Your Honor, John M. Comiskey for F.W.

25  Sims.  Two points that I would like to raise; number one,

*In re Richards Conditioning Corp.* - 7/8/10                    7

1  regarding the contractual amount that was agreed to in the

2  purchase order, and Richards clearly knew the amount that was

3  going to be paid.  And quite frankly, Richards has no standing

4  now to object to amounts that Sims was going to pay its own

5  laborers.  That's -- you know, they have absolutely no right to

6  object to that, especially when they knew about the amount that

7  they were going to be paid pursuant to the purchase order.

8          Secondly, regarding the lien --

9          THE COURT:  Well let's stop one that one.

10         MR. COMISKEY:  Sure.

11         THE COURT:  Does the contract specifically allocate

12  where their money is going?

13         MR. COMISKEY:  I don't believe that specifically

14  limits the amount that is to be paid to the laborers.  And even

15  if it --

16         THE COURT:  Well, when you say it -- it's the other

17  way around, right?  Does it provide that the laborers will get a

18  certain hourly amount?

19         MR. COMISKEY:  Well so long -- there's no issue here,

20  so long as they are being paid the minimum amount required by

21  law.  They were --

22         THE COURT:  But the contract is with the debtor;

23  right?

24         MR. COMISKEY:  Correct.

25         THE COURT:  So the contract contemplates a specific

*In re Richards Conditioning Corp. - 7/8/10*                    8

1   amount going to various sources; right?

2            MR. COMISKEY:  Right.

3            THE COURT:  So why isn't the debtor entitled to take

4   discovery as whether the contract was breached or not?

5            MR. COMISKEY:  They've already paid the full amount of

6   the contract.  There was never any claim up to this point.

7            THE COURT:  But we just said that the contract

8   allocated the amounts to specific sources.  Why aren't they

9   allowed to take discovery as to whether, in fact, the contract

10  was performed by having the amounts go to the specific sources?

11           MR. COMISKEY:  It doesn't make any difference

12  specifically to vis-a-vie Richards.

13           THE COURT:  Well then why was it in the contract?  It

14  seemed to make a difference to them because they put it in the

15  contract.

16           MR. COMISKEY:  But the contract only provides a

17  minimum amount that's to be paid.

18           THE COURT:  And do you contend that that amount was,

19  in fact, paid?  Why can't they take discovery into whether it

20  was -- they're saying it wasn't paid.

21           MR. COMISKEY:  Well our contention is what difference

22  does it make whether it was paid?  They --

23           THE COURT:  There was a contract.  People --

24           MR. COMISKEY:  But they have no right to object to

25  what we --

*In re Richards Conditioning Corp.* - 7/8/10                              9

1      THE COURT:  Oh, they don't have a right to enforce

2  their contract?

3      MR. COMISKEY:  No, that's not what I am saying, Your

4  Honor.

5      THE COURT:  Well then what are you saying?

6      MR. COMISKEY:  What I am saying is they don't have

7  standing to object to an amount that Sims agrees to pay its

8  laborers.

9      THE COURT:  They agreed with the debtor that Sims

10  would pay its laborers X.  That's the standard, the contract.

11      MR. COMISKEY:  No, I understand that but that's not

12  the point here.

13      THE COURT:  It isn't?

14      MR. COMISKEY:  No.

15      THE COURT:  Why?

16      MR. COMISKEY:  Because regardless of the language that

17  is -- the contract contemplates a minimum amount that's paid to

18  Sims' employees which, in fact, was paid.

19      THE COURT:  But isn't that what they want to take

20  discovery on, to see whether in fact that was the case?  Are you

21  saying they already know that?

22      MR. COMISKEY:  Well let's assume that wasn't the case.

23  Then how does that affect them in any way?

24      THE COURT:  Because -- are you saying there are no

25  damages?

*In re Richards Conditioning Corp. - 7/8/10*                    10

1      MR. COMISKEY:  Correct.

2      THE COURT:  On what theory?

3      MR. COMISKEY:  Well they were already paid the full

4  contract price.  They agreed to it in advance and now they're

5  going to come back after this is all done --

6      THE COURT:  No, that's a different point.  They may

7  have paid the -- look, if I agree with you that I am going to

8  pay you a hundred dollars for X and a hundred dollars for Y and

9  a hundred dollars for Z, there's a reason why I agreed to those

10 three things.  If instead, you take three hundred dollars and

11 apply it all to Z, then you've breached the contract; right?

12 All right.  I am going to grant this application as far as -- I

13 am going to -- I'm sorry.  I am going to overrule Sims'

14 objection.

15     MR. COMISKEY:  Well one other point, if I may, Your

16 Honor, regarding the lien lock land.  They are just plain wrong.

17 They don't have -- they're not a potential beneficiary of any

18 trust.  They are a --

19     THE COURT:  They may not be but the other material men

20 who worked on the job may be before the contractor gets the

21 profit; right?

22     MR. COMISKEY:  That would be anybody that Sims' was

23 required to pay and what standing do they have regarding -- vis-

24 a-vie what Sims is required to pay.  They don't have any

25 standing regarding that.

*In re Richards Conditioning Corp. - 7/8/10*          11

1    THE COURT:  What is your response on that point?

2        MS. PENACHIO:  Your Honor, I respectfully disagree.

3   We do have standing because those creditors filed claims in the

4   debtor's case and we have --

5        THE COURT:  Sims' creditors?

6        MS. PENACHIO:  Yes, Local 38, for example, filed a --

7   and Richards' creditors, the creditors that worked on this job.

8        THE COURT:  But were they working on it for Sims?

9        MS. PENACHIO:  At least Local 38 was.  And, Your

10  Honor, I would like to also point out that there is annexed to

11  Sims' papers a schedule of amounts that were due to workers as

12  part of the contract --

13       THE COURT:  Right.

14       MS. PENACHIO:  -- in their objection.  But I would

15  just like to make --

16       THE COURT:  But how -- explain to me, I think we went

17  through this at the beginning of the hearing.

18       MS. PENACHIO:  Yes.

19       THE COURT:  But explain to me again how -- you want to

20  confirm whether or not Sims allocated to itself the amount that

21  was supposed to be paid to the workers that Sims was hiring

22  under the contract with Richards; right?

23       MS. PENACHIO:  Yes, Your Honor.

24       THE COURT:  All right.  Assuming you confirm that,

25  that instead of paying the amount, the surplus or whatever --

*In re Richards Conditioning Corp. - 7/8/10*                    12

1   however you want to characterize it, the amount to the workers,

2   Sims took it as profit, how does that affect the debtor?

3          MS. PENACHIO:  Because the debtor was --

4          THE COURT:  Besides the fact that the debtor bargained

5   for it in the contract.

6          MS. PENACHIO:  The debtor then -- management which is

7   not an Article 3(a) creditor trust fund claimant --

8          THE COURT:  Right.

9          MS. PENACHIO:  -- received a benefit from the job

10  whereas other -- whereas trust fund claimants did not.

11         THE COURT:  But would those be trust fund claimants

12  against Richards or against Sims?

13         MS. PENACHIO:  Primarily against Richards.  So

14  Richards pay Sims an excess of what it -- and did not pay

15  another material man.

16         THE COURT:  Well if the -- but if the money had gone

17  to the workers as the contract provided, there wouldn't have

18  been any excess for the -- are you basically saying that there

19  was really no understanding with the workers that they get paid

20  in the first place so that the debtor overpaid?

21         MS. PENACHIO:  Yes, that is what we're saying that

22  this was a -- there is a theory that this was a kicker for Sims'

23  management and not for Article 3(a) claimants.  And the kicker

24  for management diminished --

25         THE COURT:  But are any of those workers asserting

*In re Richards Conditioning Corp. - 7/8/10*            13

1    claims against the debtor or their union?

2          MS. PENACHIO:  Your Honor, it is my understanding that

3    they are but may I have a moment to clarify with Mr. Hopwood?

4          THE COURT:  Yes.

5          (Counsel confer.)

6          MS. PENACHIO:  Not to our knowledge, Your Honor.

7          THE COURT:  So what are the damages to the debtor if,

8    in fact, Sims didn't perform the contract and instead of paying

9    the workers, took the extra money.

10         MS. PENACHIO:  Then the debtor did not have the extra

11   money to pay its claimants.  It paid Sims with trust -- the

12   money that Richards received to pay Sims was trust fund money.

13         THE COURT:  So basically you're saying that Sims

14   didn't perform its bargain in the first place and the debtor

15   didn't bargain to let Sims have a profit rather it bargained to

16   let the workers be paid.

17         MS. PENACHIO:  Yes.

18         THE COURT:  All right.  Which is where we were at the

19   beginning.

20         MR. COMISKEY:  Yes, but --

21         THE COURT:  I think that's a legitimate, I mean --

22         MR. COMISKEY:  But, Your Honor, that doesn't make any

23   difference.

24         THE COURT:  Well I don't --

25         MR. COMISKEY:  Like you said, how are they damaged?

*In re Richards Conditioning Corp.* - 7/8/10                14

1          THE COURT:  I'm sorry.  I don't think that

2    contracts --

3          MR. COMISKEY:  How would they be damaged though?

4          THE COURT:  Well, we'll see that if they find out that

5    it happens.  There's a reason why people agree to certain things

6    and we'll find out whether they agree to them or not but they

7    did agree to them and a contract means something.

8          MR. COMISKEY:  I just don't see the damage but --

9          THE COURT:  Well, we'll see that if, in fact, it turns

10   out to be true.  All right?  But there's clearly cause for an

11   examination here based on the allegations -- on a, you know, a

12   credible allegations.  It's not been denied.  In fact, the

13   answers -- the response has gone out of its way not to deny it,

14   that Sims breached the contract.  Something is odd here.

15   Something was drafted in a way that misled the debtor.  So the

16   debtor's entitled to find out whether, in fact, that's true,

17   unless Sims is willing to concede that it didn't pay this amount

18   and then you don't need the discovery.  Is Sims prepared to

19   concede that?

20         MR. COMISKEY:  At this point, I don't have enough

21   knowledge whether that's the case.

22         THE COURT:  All right.  So there's a reason for the

23   examination to figure out what actually happened.  All right.

24   So let's then turn to the Sciame objections, to all three of the

25   motions.

*In re Richards Conditioning Corp. - 7/8/10*          15

1      MR. WANDER:  Thank you, Your Honor.  Your Honor, I

2   think the Rule 2004 examination needs to be broken down into two

3   separate parts because the debtor in its application in fact

4   refers to two different areas of examination.  One area, we

5   don't really find objectionable and Sciame has already responded

6   to constructively by providing the debtor with the information

7   requested.

8      THE COURT:  Did it provide the insurance policy and

9   payments under the insurance policy?

10     MR. WANDER:  We have not yet but I told --

11     THE COURT:  And this was made in September of 2009?

12     MR. WANDER:  Uhm.

13     THE COURT:  I would not call that constructive.

14     MR. WANDER:  But, Your Honor, what we were originally

15  discussing with counsel for the debtor and other creditors in

16  the case was to provide the lien law type of statement that any

17  trust fund beneficiary such as Sciame and such as the debtor

18  Richards would provide whereby --

19     THE COURT:  Was that provided?

20     MR. WANDER:  Yes, Your Honor.

21     THE COURT:  When?

22     MR. WANDER:  I think in December.

23     THE COURT:  Okay.

24     MR. WANDER:  And what was provided, Your Honor, was

25  first a certification by an officer of Sciame that accounted for

*In re Richards Conditioning Corp. - 7/8/10*                    16

1  every dollar that Sciame received from Cooper Union on account

2  of the work performed by Richards construction.  And in addition

3  to the certification, we provided, when I say voluminous

4  documentation, I'm talking about several very large three-ring

5  binders that I did not bother to bring to court today, but would

6  have made a nice stack of documentation on the desk here.

7          And what the documentation included was a copy of

8  every requisition or application for payment submitted by

9  Richards to Sciame.  I think there were 31 of them

10 approximately, with all of the backup that was provided by

11 Richards.  And all of the payments that Sciame received from

12 Cooper Union and copies of all of the payments that Sciame then

13 made either directly to Richards or to one of Richards vendors

14 or subcontractors with canceled checks showing every single

15 payment.  And a spreadsheet tying all that information into

16 about a five page spreadsheet, listing each requisition by

17 Richards, each payment Sciame received from Cooper Union, and

18 each check Sciame then remitted.  So someone could look at both

19 the certification by Mr. Colletta of Sciame, the spreadsheet and

20 then all of the backup information.

21         We've provided that approximately five to six months

22 ago.  That was what had been discussed by the parties should be

23 provided which is the requirements under the lien law to account

24 for the funds as a trust fund beneficiary.  And I might add,

25 Your Honor, what the spreadsheet and the analysis showed is not

*In re Richards Conditioning Corp. - 7/8/10*                    17

1   only did Sciame pay to Richards or its vendors every dollar it

2   received from Coopers, it also advanced approximately two

3   hundred plus thousand dollars in addition to Richards or to its

4   subs because at various times in the project, Richards would

5   come to Sciame and say they are short of money, can you advance

6   funds and Sciame did that.  And when the dust settled on the

7   accounting and every dollar was ticked and tied to every

8   application and every check, Sciame had overpaid by several

9   hundred thousand dollars.

10          In addition to those payments and that documentation,

11  what I have said to counsel for Richards and I received from my

12  client, a spreadsheet and getting the backup checks, this is for

13  additional payments, not from the trust funds but additional

14  payments out of pocket that Sciame has made both being

15  reimbursed by Zurich under the subguard and not being reimbursed

16  by Zurich because there's a five hundred thousand dollar

17  deductible.

18          And we're going to voluntarily give them that

19  information so that to the extent a creditor has filed a proof

20  of claim for an invoice that Sciame paid or if Richards lists on

21  its schedules an unpaid invoice, but Sciame has paid that, we

22  are going to give them that information also.

23          And if they have any questions about that information,

24  I don't have any problem with my client being deposed on what

25  they have provided and if counsel for debtor has a question for

*In re Richards Conditioning Corp. - 7/8/10*          18

1   me that we could handle informally between attorneys and I can

2   get backup information, which I don't think they'll need because

3   we've supplied them with every check front and back to show

4   every payment.

5          And in my initial limited objection to the Rule 2004,

6   I said we were going to voluntarily provide the information that

7   was a reasonable request by Richards and we've done that and

8   we'll continue to do that.  And I submit that if Your Honor saw

9   the submission that we made, Your Honor would be quite impressed

10  with the detail, the thoroughness and the voluminous nature of

11  the backup documentation.

12         Then there is the --

13         THE COURT:  No, let's -- before we move to that, is

14  the debtor still seeking additional documentation under Rule

15  2004 with respect to this prong of the request?

16         MS. PENACHIO:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MS. PENACHIO:  Your Honor, while it is correct that

19  Mr. Wander did submit voluminous documents, most -- the vast

20  bulk of those documents were limited to the debtor's

21  requisitions and Sciame's payment and the certification of Mr.

22  Colletta or Mr. DaRos the principal of Sciame.

23         Your Honor, we received no information regarding

24  payments that Sciame received from Cooper Union and no

25  information regarding what payments Sciame received from its

*In re Richards Conditioning Corp. - 7/8/10*                19

1   insurance carrier.

2          THE COURT:  Okay.  Well Mr. Wander just said he is

3   going to give you that information; right?

4          MS. PENACHIO:  Yes, so that would be --

5          THE COURT:  All right.

6          MS. PENACHIO:  But, Your Honor --

7          THE COURT:  But I thought he said he did provide you

8   with the checks -- the check history of the history of payments

9   from Cooper Union; no?

10          MS. PENACHIO:  Your Honor, I don't believe so.

11          THE COURT:  Okay.

12          MS. PENACHIO:  I don't recall getting that.  May I

13  just -- Mr. Hopwood reviewed the submission.  I don't recall

14  getting that, Your Honor.  I --

15          THE COURT:  Do you have any issue with providing that

16  if it hasn't been provided?

17          MR. WANDER:  No, Your Honor.

18          MS. PENACHIO:  Okay.

19          THE COURT:  Okay.  And, of course, this is all, I am

20  assuming, because it was in the context of the certification,

21  but I mean if this is done under Rule 2004, it has to be done in

22  a way where the party providing the document state is that we

23  have made a diligent search, these are all of the documents that

24  are responsive within our control or in our possession; i.e.,

25  we're not selectively providing documents.  I'm assuming that's

*In re Richards Conditioning Corp. - 7/8/10*          20

1   what has been the case here or in --

2          MR. WANDER:  Yes, the documents were provided under

3   cover of the certification --

4          THE COURT:  Okay.  Fine.

5          MR. WANDER:  -- that I believe was filed.

6          THE COURT:  And that would be the case for the

7   insurance and the payments from Cooper, to the extent they

8   haven't been provided.

9          MS. PENACHIO:  Your Honor, all the debtor wants is to

10   know how much Sciame was paid and what happened with the money.

11          THE COURT:  All right.  But Mr. Wander said he is

12   prepared to provide that.

13          MS. PENACHIO:  Then very well, Your Honor.

14          THE COURT:  I thought he said he had provided it but

15   if they haven't, they should.

16          MS. PENACHIO:  Very well, Your Honor.

17          THE COURT:  Okay.  So I mean I don't know whether -- I

18   mean to my mind, there's nothing -- having this under an order

19   saves time in the future.  If you're working together on it,

20   there's no reason not to have it under a 2004 order.  You've

21   already complied largely with what I would have ordered a few

22   months ago.  Am I missing something there?

23          MR. WANDER:  No, Your Honor.

24          THE COURT:  Okay.  All right.

25          MR. WANDER:  And I would be happy to work with counsel

*In re Richards Conditioning Corp.* - 7/8/10          21

1   to take their proposed order --

2          THE COURT:  All right.

3          MR. WANDER:  -- and with what we have just stated on

4   the record --

5          THE COURT:  To cover that, to avoid duplication from

6   what's already been provided and to just have the proposed order

7   on this prong cover what's not been provided so far, so you

8   don't have to go through the whole process again for documents

9   you have already provided.

10          MR. WANDER:  Correct.

11          THE COURT:  Okay.

12          MR. WANDER:  And I will -- correct.  I just want to

13   make one thing clear, when we're talking about the documentation

14   that we're providing, I believe it relates to the payments to

15   Richards' subcontractors.  For example, if Sciame was entitled

16   under its subguard policy to get reimbursed for its legal fees,

17   that's not any money that in any way would be earmarked or go to

18   Richards' --

19          THE COURT:  Well I think they're entitled to see what

20   you got.  That's all.

21          MR. WANDER:  Your Honor?

22          THE COURT:  I mean if it's an internal accounting

23   thing, as opposed to what the insurance did or if the insurer

24   doesn't care and you just told them to pay the fees but not the

25   -- they're entitled to see what came under the policy.

*In re Richards Conditioning Corp. - 7/8/10*                    22

1       MR. WANDER:  Your Honor, respectfully let me tell you

2   why I believe what we should be giving them should be limited.

3   We've never had any issue -- the subguard policy, okay, is

4   between Zurich Insurance and Sciame.  It's not a payment bond

5   where anyone can make a request for payment who has not been

6   paid.  And with respect to what Richards cares about, the only

7   issue it should care about is what money was paid to its vendors

8   because if Sciame is entitled to a reimbursement under an

9   insurance policy with a third party that has nothing to do with

10  Richards but covers the whole project, then Richards has no

11  business asking what --

12      THE COURT:  But Sciame's filed a claim against the

13  debtor; right?

14      MR. WANDER:  No, Your Honor.

15      THE COURT:  Or will file a claim against the debtor;

16  isn't it?

17      MR. WANDER:  No, Your Honor.

18      THE COURT:  It's not making any claim against the

19  debtor?

20      MR. WANDER:  Correct, Your Honor.  We have expressly

21  decided not to file a proof of claim in this case in order not

22  to allow the debtor in a procedural opportunity to go into areas

23  where we do not believe they're entitled to go.  So we did not

24  file a proof of claim.  The bar date has passed.  Because we

25  want to limit our involvement in this case to that which relates

*In re Richards Conditioning Corp. - 7/8/10*                    23

1   to the debtor and we want to avoid allowing the debtor to pursue

2   an agenda to harass Sciame with discovery requests that have

3   nothing to do with it but is part of its own agenda that we

4   believe is improper.  We have a release.  So we don't want to

5   give them any opportunity that they're not entitled to.

6   Whatever they're entitled to that's reasonable, Your Honor, I am

7   volunteering and have volunteered to give them.  But they're not

8   entitled to go into Sciame's business with other third-parties

9   that has no affect on their case.  And if Sciame was entitled,

10  for example, to get reimbursement for my legal fees under a

11  subguard policy, that's no business of the debtor.

12          THE COURT:  Okay.  All right.  I understand that

13  point.

14          MR. WANDER:  Thank you.  And I will work debtor's

15  counsel to put the appropriate language in a proposed order that

16  we'll submit to Your Honor.

17          THE COURT:  Well is there any other -- I mean we are

18  having the hearing now and I just want to make sure I -- is

19  there any other problem or caveat to the first prong of their

20  request that --

21          MR. WANDER:  No.

22          THE COURT:  Okay.

23          MR. WANDER:  Nothing that comes to mind, Your Honor.

24          THE COURT:  Okay.  So really what would be carved out

25  of that would be the information you have already provided

*In re Richards Conditioning Corp.* - 7/8/10          24

1   because there is no reason to provide it again and unless I am

2   missing something, Ms. Penachio, I don't see why given that they

3   haven't filed a claim, that other payments under the insurance

4   policy that didn't go to the 3(a) claimants or people that have

5   filed claims against the debtor, would be relevant.

6         MS. PENACHIO:  Your Honor, I disagree and I would like

7   to tell you why.  Getting a subguard policy was a condition to

8   Richards entering into this contract.  So Richards entered into

9   the contract with Sciame, an unbonded job, knowing that there

10  was a policy to cover default.  It has a right to know why its

11  Article 3(a) claimants that worked on the job weren't paid by

12  the proceeds of that -- from the proceeds of that policy.

13  They're in essence --

14        THE COURT:  Well but was the agreement such that it

15  spelled out what the policy would cover specifically, that it

16  wouldn't also cover attorneys fees and things like that?

17        MS. PENACHIO:  Your Honor, I believe it's unclear as

18  to that.  I don't know the answer and I apologize but I would

19  have to really look at the policy.

20        THE COURT:  Well this is what I am going to have you

21  do.

22        MS. PENACHIO:  Okay.

23        THE COURT:  This issue really wasn't flagged in either

24  the objection or the reply or the supplemental objection.  I am

25  going to ask you both to look into the underlying facts which is

*In re Richards Conditioning Corp. - 7/8/10*                    25

1    how did the contract between Sciame and the debtor reference

2    this policy and -- do you have a copy -- you don't have a

3    problem giving them a copy of the policy, I guess, right, the

4    policy itself?

5         MR. WANDER:  No, Your Honor.

6         THE COURT:  Okay.  So then look at the policy and see

7    if it complied -- I understand Mr. Wander's argument which is we

8    paid for a policy.  The policy covers things that aren't

9    relevant to the debtor.  Your argument is well the whole

10   policy's relevant to the debtor because we bargained for it.  So

11   you should be able to look at the policy and see whether, in

12   fact, you did bargain for a specific type of policy that only

13   covered employees as opposed to giving Sciame other rights to

14   get insurance payments.  Do you understand what I am saying?

15        MS. PENACHIO:  I do, Your Honor.

16        THE COURT:  Okay.  So just look at that and maybe

17   you'll work it out.  I hope you will.  If not, just bring

18   another 2004 on that point or bring -- come back to me on that

19   point.

20        MR. WANDER:  Your Honor, I would like to give counsel

21   a confidentiality agreement when we do give that.  We do not

22   want this document just floating around world.

23        THE COURT:  That's fine.  I don't -- that's fine.

24        MS. PENACHIO:  Yes, I would agree to that, Your Honor.

25        THE COURT:  Okay.  All right.  So --

*In re Richards Conditioning Corp. - 7/8/10*                    26

1         MR. WANDER:  That's one of the two issues.

2         THE COURT:  All right.  And that's really just a

3    matter of what -- of finalizing the order.  And if it can't be

4    finalized within a reasonable time, which is what I would assume

5    is about ten days, then submit an order, cc Mr. Wander and he

6    can submit a counter order.  But I hope we don't get to that

7    point.

8         MR. WANDER:  I don't expect we will, Your Honor.

9         THE COURT:  Okay.

10        MR. WANDER:  Okay.  The second aspect of the Rule 2004

11   application by the debtor is not as counsel described a plain

12   vanilla type of Rule 2004 request.  From the beginning, we

13   objected to this line of inquiry and we pointed out that we had

14   a release, et cetera.

15        Now there's even more of a reason not to grant this

16   prong of the application which is the debtor's principal has now

17   testified under oath at his Rule 2004 examination of the debtor,

18   "We're in the process of preparing an adversary proceeding.  I

19   have met with multiple different law firms to discuss with them

20   prosecuting a claim."

21        And in debtor's reply, they acknowledge the claim

22   they're talking about is a claim against Sciame and, in fact,

23   they have prepared a -- I think counsel's characterization was a

24   crude outline, presumably referring to a complaint.  So here it

25   is the debtor's decided to sue.  They're shopping the claim to

*In re Richards Conditioning Corp.* - 7/8/10                    27

1   other law firms.  And under -- as *Collier* sets forth and we cite

2   it in our objection, when an adversary proceeding is likely to

3   be commenced, it's improper to use Rule 2004 as an end run

4   around Federal Rules of Civil Procedure 26 and its protections.

5          So putting aside the fact that this whole area to me

6   is improper from the get go because they gave us a complete

7   release, we cited the legal authority that the only way to get

8   out of a release is if there was fraud in signing the release,

9   their claim --

10          THE COURT:  Hold on.  If the release is a fraudulent

11   transfer.

12          MR. WANDER:  Yes, Your Honor.  The fraud they're

13   talking about is when they made the bid, they underbid the job.

14   And I may add that Mr. Hopwood testified at his Rule 2004 exam

15   is the debtor has a history of underbidding its jobs, even

16   predating the Sciame-Cooper Union job and that is why Mr.

17   Hopwood in the end kicked out his brother who is no longer with

18   the company and he has taken over the bidding is because that's

19   what evidently has gotten them into the financial trouble

20   they're in.

21          So the claim relates to the initial bid which we

22   believe we're absolved under the release including Cooper Union.

23   So putting aside the frivolous nature of the claim, now that

24   they still believe there's merit and they're shopping the claim,

25   allowing them to engage in a Rule 2004 examination basically to

*In re Richards Conditioning Corp. - 7/8/10*                    28

1   get their evidence for the lawsuit, is just simply improper and

2   that part of the application should be denied.

3        THE COURT:  Well let me -- I mean I think that the

4   tension in your argument is highlighted by the two aspects of

5   the argument.  Under Rule 2004 and the case law, if there's an

6   objection to a 2004 exam, the debtor needs to show cause for the

7   exam and we just went through that with Sims.  You can't show

8   cause if you want to inquire into a potential lawsuit unless

9   you've thought about the lawsuit and talked to lawyers about it.

10  And at least considered bringing such a lawsuit.  You can't show

11  cause.

12       I mean how can you show cause when you say I want to

13  depose X, Y and Z to see whether we have a cause of action

14  unless you've thought about the cause of action.  On the other

15  hand, clearly Rule 2004 isn't to be used in derogation of the

16  adversary proceeding rules but I think that the notion that

17  you're -- you know, you're talking to lawyers and preparing to

18  bring an action isn't, you know, necessarily enough.  I mean, in

19  fact in Judge Gropper's case, he says that basically the only

20  way to preclude the discovery into potential causes of action is

21  for the target to admit that there's a cause of action.  Then,

22  you know, of course you don't need the lawsuit.

23       MR. WANDER:  Your Honor, I agree but here's what is

24  different in this case.  Nine months ago when the debtor filed

25  the application, it said we believe we may have a cause of

*In re Richards Conditioning Corp. - 7/8/10*                29

1  action.

2        THE COURT:  Right.

3        MR. WANDER:  Since then, they now evidently believe

4  they have a cause of action and they're now simply trying to

5  find a law firm that will prosecute it instead of debtor's

6  counsel, presumably on a contingency basis.  So they've gone

7  from the exploratory phase to now the phase of who can we have

8  file the complaint.

9        THE COURT:  Well how do we -- this is based on the --

10  on what?  On the line in the deposition?

11        MR. WANDER:  Correct.  On Mr. Hopwood testifying

12  "We're in the process of preparing an adversary proceeding.  I

13  have met with multiple different law firms to discuss with them

14  prosecuting a claim."  So they've gone beyond the exploratory

15  phase.

16        THE COURT:  Yes, but I -- again, you represent a

17  debtor.  You don't even necessarily have to go to an outside

18  firm.  You talk to one of your litigators.

19        MR. WANDER:  Agreed.

20        THE COURT:  And you say, you know, do we have a claim

21  here if X, Y and Z is true.

22        MR. WANDER:  Agreed.  However, they have now nine

23  months later, they haven't been doing nothing for nine months.

24  Evidently, they now are at the position of "prosecuting a

25  claim --"

*In re Richards Conditioning Corp. - 7/8/10*          30

1    THE COURT:  Well let me -- Ms. Penachio, have you

2  gotten additional information from other sources that's led you

3  to be in a position to prosecute a claim today?

4    MS. PENACHIO:  Not really, Your Honor.  The reason why

5  this is a somewhat difficult lawsuit is the fact that any

6  recovery would presumably not be property of the estate under

7  Article 3(a) of the lien law but be the property of the material

8  men and tradesmen that worked on the --

9    THE COURT:  But that's a different --

10   MS. PENACHIO:  I know it's a different issue but it

11  complicates the analysis of a lawsuit.

12   THE COURT:  But is that -- no, but are you in the

13  position to file the complaint today or in a week or so

14  regardless of whether you get this information and the only

15  thing that is holding you back are other considerations such as

16  who benefits from the lawsuit?

17   MS. PENACHIO:  No, Your Honor, we're not in a

18  position; other than a crude outline and theories, we --

19  absolutely not.  This is really the hopes that -- on the part of

20  the debtor that there will be a recovery at some point from

21  Sciame but not --

22   THE COURT:  Well, wait.  What is your response to the

23  argument that there isn't any cause here to take discovery of

24  either Sciame or Cooper Union or Sims about the value of the

25  contract or the value of the release or the circumstances

*In re Richards Conditioning Corp. - 7/8/10*                    31

1  surrounding the entry into the contract or the Sims contract

2  because the debtor already gave a release to Sciame?

3      MS. PENACHIO:  Your Honor, the debtor believes that

4  that release was fraudulently induced.  That Sciame for lack of

5  a better term, set the debtor up.  That this was a contract that

6  was doomed to fail from the get go.  That Sciame was smart

7  enough to put a subguard insurance policy in place.

8      THE COURT:  Well, wait, so the theory would be that

9  but for the release, you would have a cause of action against

10 Sciame based on like what, fraud and duress?

11     MS. PENACHIO:  Fraud and the inducement --

12     THE COURT:  Right.  And then as far as the release is

13 concerned, I mean you would have to get over that too because

14 you only have that claim but for the release.

15     MS. PENACHIO:  Correct, Your Honor.  The release --

16 but the debtor believes that the release -- the release is

17 invalid for two reasons; one, it is a fraudulent conveyance done

18 -- executed during the fraudulent conveyance period and then --

19 or it may even be a preference arguably.  And second that it was

20 based upon fraud.  And these are theories.  They need to be

21 flushed out.

22     THE COURT:  All right.

23     MS. PENACHIO:  I would like to flush them out before

24 bringing an adversary proceeding because I --

25     THE COURT:  Okay.

*In re Richards Conditioning Corp. - 7/8/10*                    32

1          MS. PENACHIO:  And any allegations --

2          THE COURT:  Has the debtor hired an outside firm to

3    bring this cause of action?

4          MS. PENACHIO:  The debtor has not, Your Honor.  And

5    it's difficult for the debtor to find an attorney.

6          THE COURT:  All right.

7          MR. WANDER:  Your Honor, I submit two reasons why the

8    debtor has not satisfied its showing of cause.  Number one, with

9    respect to the release, Mr. Hopwood is an attorney and for him

10   to somehow say he was fraudulent -- there was some fraud in the

11   release that he signed, just doesn't to me pass the smell test.

12   And there was consideration.  It's right in the agreement where

13   Sciame agreed to do various things including increasing the

14   contract by a million dollars.  So they haven't overcome the

15   release.

16         THE COURT:  Well what if the value of the release to

17   Sciame and the amount that the debtor actually gave up in the

18   release was -- I am just picking a number out of the air -- you

19   know, four million dollars?  So, one million for four million

20   would be a constructive fraudulent transfer.

21         MR. WANDER:  Well again, the debtor hasn't made any

22   showing with respect to that.  And also, Your Honor, counsel in

23   her original remarks completely undercut any claim they have.  I

24   am not necessarily agreeing with her but when she said the

25   beneficiary of the claim they're talking about are the Article

*In re Richards Conditioning Corp.* - 7/8/10          33

1   3(a) claimants, the debtor wouldn't even have standing in

2   this --

3           THE COURT:  But these are people who asserted claims

4   against the debtor; right?  So to the extent that they're not

5   being paid out of 3(a) trust funds, they would be asserting

6   claims against the debtor.

7           MR. WANDER:  And if any of these Article 3(a)

8   claimants thought they had any kind of a claim, then they could

9   bring an appropriate action.

10          THE COURT:  I don't understand that.

11          MR. WANDER:  Because a debtor doesn't have -- I do not

12  believe, Your Honor, that a debtor has standing to prosecute

13  claims relating to 3(a) funds.  For example, a debtor can't sue

14  on a preference if the recovery would be Article 3(a) funds.

15  The courts have thrown those lawsuits out.

16          THE COURT:  No, but that's a different -- that's where

17  they're creditors.  They do it as well in a Chapter 7 case.

18  It's a different defense.

19          MR. WANDER:  Well, Your Honor, I believe it's

20  applicable that the debtor could not commence a lawsuit seeking

21  to collect funds that were Article 3(a) funds.  But again, Your

22  Honor, I don't believe that the debtor has met a showing of

23  cause in order to go into this Rule 2004 examination which --

24  and a separate issue, Your Honor, is the nature of the document

25  request which is so voluminous we would be taking an inordinate

*In re Richards Conditioning Corp. - 7/8/10*                34

1   amount of time dealing with that.  But on its merits, they

2   haven't shown cause.

3           THE COURT:  Why is it?  What's the -- I mean --

4           MR. WANDER:  Your Honor, they have not --

5           THE COURT:  Why is it so burdensome?

6           MR. WANDER:  I will tell you, Your Honor.  Their

7   theory which I don't believe they have articulated sufficient to

8   show that there's any kind of a claim is that this debtor

9   submitted a bid that Sciame should not have accepted.  And I

10  don't believe in their papers they have cited any legal

11  authority, a single case, for a proposition that there's a claim

12  for someone to accept a low bid.  There's no support in these

13  papers other than using a phrase "fraudulent inducement."  They

14  haven't said what it is that they claim Sciame did that would

15  result in any kind of a prima facie claim.

16          So if they can't articulate a legal basis for a prima

17  facie claim --

18          THE COURT:  All right.  So what's the answer to that?

19          MS. PENACHIO:  Your Honor, I can't plead fraud with

20  particularity without specifics.

21          THE COURT:  No, but the theory, I mean --

22          MS. PENACHIO:  It --

23          THE COURT:  Do you have some --

24          MS. PENACHIO:  I have legal theories.

25          THE COURT:  Is there some belief that, for example,

*In re Richards Conditioning Corp. - 7/8/10*                    35

1   Sciame said that the cost of this deal will be X and that was

2   why you made the bid at, you know, X plus a profit?  And then it

3   turned out later, the cost of this deal was actually X plus way

4   more than that.

5         MS. PENACHIO:  Yes, Your Honor, in two ways Sciame --

6   primarily two ways.  First, Sciame made material

7   misrepresentations to the debtor which caused the debtor to make

8   a bid that was lower than proved to be profitable.

9         THE COURT:  All right.  Okay.

10        MS. PENACHIO:  The second was that the debtor's

11  principal, Mr. Hopwood, when he made the bid, expressed concerns

12  about underbidding the job to one of Sciame's principals.  Mr.

13  Hopwood essentially said I don't want to be the low bidder.  I

14  -- there was a -- because I have had problems in the past with

15  underbidding jobs.  And he said, no, you're not the low bidder.

16  And there was another unsuitable company that was the low bidder

17  and Mr. Hopwood relied on that representation.

18        THE COURT:  Well that just means that someone else

19  made a mistake, too.  I am not sure that means anything.

20        MS. PENACHIO:  Well there was no other low bidder.

21  There was -- believe that there was no bidder lower than

22  Richards and that --

23        THE COURT:  Well was it -- all right.

24        MS. PENACHIO:  See, having another low bidder gave --

25        THE COURT:  They were sealed bids though, right?  The

*In re Richards Conditioning Corp.* - 7/8/10                36

1   other bidders weren't allowed to see -- no?

2        MS. PENACHIO:  No, they were not sealed bids.  So Mr.

3   Hopwood had a comfort level with making the bid based upon the

4   misrepresentation that there were other lower bidders.

5        THE COURT:  All right.

6        MR. WANDER:  Your Honor, if I may respond?  That kind

7   of, I believe, proves my point which is they have not

8   articulated any factual basis with any case law that shows that

9   under their fact scenario there is any type of claim they could

10  have.  And I have a suggestion, Your Honor.

11       THE COURT:  Well but Ms. Penachio just said they

12  believed that there were representations made as to the actual

13  cost of the project that were way out of line.

14       MR. WANDER:  Well again, Your Honor, what I believe is

15  the Court should deny this part of the application without

16  prejudice and if they can come to Your Honor with a legal

17  theory --

18       THE COURT:  She just did.

19       MR. WANDER:  Well, Your Honor, counsel just stating

20  that in court saying what Mr. Hopwood tells her someone else he

21  thinks said, I don't know that that in any way under applicable

22  law --

23       THE COURT:  Have you read *In Re: Metiom* in which Judge

24  Marrero affirmed me on literally that basis?

25       MR. WANDER:  No, Your Honor.

*In re Richards Conditioning Corp. - 7/8/10*                      37

1      THE COURT:  Well maybe you should.  318 BR 263 SDNY

2  (2004).

3      MR. WANDER:  My point, Your Honor, is the --

4      THE COURT:  "E-Plus does not cite nor is the Court

5  aware of any authority to support the claim that a showing of

6  good cause in support of a Rule 2004 examination requires

7  testimony or written statements under oath."

8      MR. WANDER:  Your Honor, I am simply stating that

9  under the facts of this case of the type of claim that they have

10  articulated, that they have not met the burden of showing cause.

11  And I am not saying that --

12      THE COURT:  I just don't see it.  I mean I don't --

13  let me turn to the burdensome nature of it because I think they

14  have asserted cause but what is -- I mean you took his

15  deposition.  Did you ask him whether anyone lied to him?

16      MR. WANDER:  I did ask those -- I'm sorry, Your Honor.

17  I was precluded from going into this line of questioning at the

18  Rule 2004 and in advance, counsel --

19      THE COURT:  Why?

20      MR. WANDER:  Because counsel had said that in agreeing

21  to the Rule 2004, that she said she would object to any

22  questioning on this line of inquiry because the debtor was

23  thinking about filing a complaint.  And if I did go into this

24  line of inquiry, she would file the complaint in advance so then

25  I would have to use the Federal Rule of Civil Procedure

*In re Richards Conditioning Corp. - 7/8/10*                    38

1   discovery devices.

2           And, in fact, when I did try and go into this area a

3   little bit, counsel cut me off and the transcript that we've put

4   in front of Your Honor --

5           THE COURT:  You only put two pages in.

6           MR. WANDER:  But that was by another attorney who

7   attended the examination who counsel allowed that attorney but

8   not me to ask a few questions.

9           THE COURT:  But did you -- I mean you didn't obviously

10  call up the Court and say look, I have a 2004 order and they're

11  not abiding by it.

12          MR. WANDER:  No, Your Honor.  Again, the point was

13  that in debtor agreeing initially to the Rule 2004 --

14          THE COURT:  But she didn't have to agree.  You could

15  have gotten it from me.

16          MR. WANDER:  Your Honor, the response was that if I

17  got it from the Court, she would file a complaint.  Back then

18  that's what she said.  Specifically, she said that if we pursue

19  this line of questioning and the documents in our proposed Rule

20  2004, the debtor would file the complaint specifically so we

21  would have the issue that I am now saying should apply to them.

22  And in order to move the --

23          THE COURT:  You know, let's go to that issue. I mean

24  everyone talks about the difference between 2004 and the Federal

25  Rules.  I have required many 2004 exams to be done pursuant to

*In re Richards Conditioning Corp. - 7/8/10*                    39

1   the Federal Rules.  It's not a big deal.  I mean you have

2   counsel there anyway.  I mean it's very rare that counsel with a

3   2004 exam insists that counsel not be present.  That's the main

4   difference.  I mean it's not -- are you prepared to do this exam

5   -- the oral exam pursuant to the Federal Rules?

6            MS. PENACHIO:  May I just have a moment.

7            (Counsel and client confer.)

8            MS. PENACHIO:  Yes, absolutely.

9            THE COURT:  It's not a big deal.

10           MR. WANDER:  Again, Your Honor, I am responding to

11  Your Honor by --

12           THE COURT:  All right.  So I just -- I mean I just

13  don't -- anyway, so let's go to the burdensome point.  Why is it

14  so burdensome to be examined on documents relating to the

15  inception of this agreement and to produce those documents?

16           MR. WANDER:  If the documents were limited to that, it

17  would not necessarily be burdensome.  But what they have

18  requested is basically every piece of paper that was created by

19  Sciame and Cooper Union relating to the Cooper Union job every

20  single subcontractor having nothing to do with Richards.  If

21  they were going to on the other hand focus the document request

22  to documents relating to the bid by Richards, and we only had to

23  for example, get documents relating to that and not to the

24  thirty or forty or I don't know, hundred other contractors, that

25  would not be as objectionable.  We can deal with that.  But

09-22525-rdd   Doc 278   Filed 07/12/10   Entered 07/15/10 10:16:21   Main Document
Pg 40 of 48

*In re Richards Conditioning Corp. - 7/8/10*                    40

1   that's not what they have asked.

2          If counsel wants to work with me on narrowing their

3   document request just to the bid by Richard --

4          THE COURT:  Well it would seem to me that would be

5   burdensome would be the whole history but what wouldn't be

6   burdensome was to see what was being said and provided to the

7   other contractors when they entered into their relationships

8   with Sciame.  I mean that's probably a pretty limited thing.

9   What would be burdensome is, you know, to take that out, you

10  know for the next four years of performance.

11         MR. WANDER:  Your Honor, the documentation for

12  Richards alone on just the payment aspect --

13         THE COURT:  No, but that's what I am saying.  That's

14  the burdensome part for the others but for the -- I would assume

15  that the documentation for entry into the agreements is probably

16  pretty limited.

17         MR. WANDER:  Your Honor, you're probably talking about

18  over fifty different subcontractors or all varying degrees.  It

19  is an unbelievably large universe of documents that get created

20  for a job like this.  Some of these discussions go on for

21  extended periods of time.  Sciame's business would stop simply

22  trying to find all of the documents relating to this that they

23  are requesting.  I have been there and I have seen just a small

24  portion of it in order to produce the documentation.

25         THE COURT:  That's different.  Again, I think that's a

*In re Richards Conditioning Corp. - 7/8/10*                    41

1   different inquiry.  The documentation that you all produced is

2   for the whole history of the relationship between Richards and

3   Sciame.

4        What I am talking about is looking at the

5   documentation of the agreements, the entry into the agreements

6   in the first place.

7        MR. WANDER:  And if it's on the Richards --

8        THE COURT:  No, no, I am not saying just Richards.  I

9   am saying --

10        MR. WANDER:  Well, Your Honor, with each other

11   subcontractor -- and again, I think there are at least fifty --

12        THE COURT:  Well it could be narrowed down to

13   representations made as to the cost of the project to the other

14   people.

15        MR. WANDER:  But --

16        THE COURT:  That's what they are really focusing on.

17        MR. WANDER:  Right, but what Sciame discussed with the

18   foundation people or the sheetrock people and all of the

19   different companies that made a bid, in addition to the one that

20   was accepted, has nothing to do with --

21        THE COURT:  No, only if it relates to -- it does if

22   Sciame makes a representation that the cost of the job will be X

23   because what they may be saying to those other people, you know,

24   under the debtor's theory may be different from what they say to

25   the debtor.

1      MR. WANDER:  But, Your Honor, the negotiations that

2   Sciame might have with different trades and different companies

3   that are submitting bids for other aspects of the job, and this

4   is a huge project, again Your Honor it has nothing to do with --

5   what they're saying is there was a representation made to Mr.

6   Hopwood which is what they're hanging their hat on their claim

7   on.  That cannot in any way be impacted by what Sciame might be

8   talking to someone who is doing the foundation and making the

9   bid.

10      THE COURT:  Well it could if they're saying different

11   things to different people.

12      MR. WANDER:  But what they might be saying to a

13   foundation person a to the bedrock in the area and the

14   seismometric test or whatever it is that you have to do for a

15   foundation, or a roof would have absolutely nothing to do with

16   the HVAC aspect.

17      THE COURT:  Well what if it says we expect you to put

18   the roof on on April 15, okay?  And at the same time they're

19   saying to Richards that you will be all done and we'll be in a

20   position to put the roof on on January 1; all right?  To me

21   that's relevant.

22      MR. WANDER:  Uhm.

23      THE COURT:  Because they're acting under one

24   assumption with the roofer and they're acting under a completely

25   different assumption with Richards.

*In re Richards Conditioning Corp. - 7/8/10*                43

1      MR. WANDER:  But, Your Honor, there's no -- there has

2  been no issue raised that what Richards claim relates to has

3  anything to do with change -- with respect to delays caused by

4  other trades or any inability to complete the job.  What they're

5  saying again is that they didn't want to be the low bidder and

6  someone at Sciame said you're not the low bidder and they

7  subsequently found out that they weren't the low bidder.  So the

8  relevance to that claim to me is --

9      THE COURT:  Look, your objection really doesn't deal

10  with burdensomeness.  I will let you make a motion to quash if

11  it turns out when you go and look at the file that, in fact, the

12  file is enormous.

13      MR. WANDER:  I did, Your Honor.  In our initial

14  objection in footnote 5 it says, "Almost all of the document

15  requests are objectionable as either relevant," and I cite

16  various --

17      THE COURT:  I know but you don't say why.  Everyone

18  throws that in.  It doesn't mean anything.  Everyone is -- I

19  mean I appreciate you don't say outrageously burdensome like

20  most people do but you say unduly burdensome --

21      MR. WANDER:  Your Honor, let me --

22      THE COURT:  But I will be liberal in considering a

23  motion to quash here when you get to the specific documents and

24  you actually go look and see what's relevant.

25      And Ms. Penachio, when you're meeting with Mr. Wander

*In re Richards Conditioning Corp. - 7/8/10*                    44

1   you should try to narrow your request to focus in on the

2   specific legal theory which you were looking to which is

3   basically that the initial deal was premised upon a

4   misrepresentation or a fraud.  And so the documents you should

5   be looking for are documents that will help you to establish

6   that or to show that that's not the case.  And that should lead

7   you to narrow down your documents to things that I think are

8   less than what you're looking for her.

9          And then Mr. Wander can go over to Sciame and look in

10  their files and see whether, you know, those types of documents

11  are, you know, a couple of file cabinets or three file cabinets

12  or whether there are five hundred file cabinets.  And then he'll

13  go back to you and say there are five hundred file cabinets

14  here.  And then he can make a motion to quash if you don't agree

15  to resolve those things, focusing on the actual facts.

16         MS. PENACHIO:  Very well, Your Honor.  I am hopeful

17  Mr. Wander and I can work this out.

18         THE COURT:  Okay.  And do you know what?  You may want

19  to take the deposition first before looking at the documents, as

20  opposed to how people normally do it but I leave that up to you.

21         MR. WANDER:  We will --

22         THE COURT:  I mean it's going to be expensive for the

23  debtor, too to look through all of these documents.

24         MS. PENACHIO:  Absolutely.

25         THE COURT:  So you should narrow it down to your legal

*In re Richards Conditioning Corp. - 7/8/10*                    45

1   theory.

2         MS. PENACHIO:  Very well.  Your Honor, I am hopeful

3   Mr. Wander and I can work out the terms of a consensual order.

4         THE COURT:  Well, I am hopeful too but again, you

5   could submit the order and I am not going to have another

6   hearing on it but you should settle it on Mr. Wander on -- are

7   you both going to be around over the next few weeks?

8         MR. WANDER:  Yes, Your Honor.

9         MS. PENACHIO:  Yes, Your Honor.

10        THE COURT:  All right.  So settle it on him on ten

11  days notice and that will give him time to submit a proposed

12  counter order.

13        MS. PENACHIO:  Your Honor, very well.  Now if I remove

14  -- I will -- based upon this hearing, I would be inclined to

15  remove some of the --

16        THE COURT:  That's fine.

17        MS. PENACHIO:  Yes and then without prejudice --

18        THE COURT:  I think you should.

19        MS. PENACHIO:  -- to ask for them later on.

20        THE COURT:  Well you can ask for more.

21        MS. PENACHIO:  Okay.

22        THE COURT:  Or you can do it, you know --

23        MS. PENACHIO:  Right, very well.

24        THE COURT:  Or you could do it under the Federal Rules

25  if you start a -- you know, you could do it under the adversary

*In re Richards Conditioning Corp. - 7/8/10*                    46

1   proceeding rules, if you start a proceeding to get more

2   information.  But the depositions will be under the Federal

3   Rules.

4           MS. PENACHIO:  Very well.  Thank you, Your Honor.

5           THE COURT:  Which I think you were living up to anyway

6   without, you know -- because obviously Mr. Wander was present.

7           MR. WANDER:  And, Your Honor, we'll also in the same

8   vain pursue that part of our Rule 2004 examination that covers

9   this area, too.

10          THE COURT:  I don't see why not.

11          MS. PENACHIO:  That was fine, Your Honor.  We may --

12  Mr. Wander and I agreed to that carve out when I agreed.

13          THE COURT:  Okay.  I mean I view that kind of as a

14  wash.

15          MS. PENACHIO:  Yes.

16          THE COURT:  I think --

17          MS. PENACHIO:  That's fine.

18          THE COURT:  But ultimately here I believe there is

19  sufficient cause and the debtor is not on the precipice of

20  bringing a lawsuit and I believe there's cause as set forth in,

21  you know, countless cases that say that a debtor can look at the

22  facts in respect of underlying lawsuit without having the

23  lawsuit in hand because again, that would put you on the other

24  end of the dilemma which is that you should be doing a 2004 if

25  you're all ready to bring the lawsuit.  I think there's enough

*In re Richards Conditioning Corp. - 7/8/10*                    47

1   here to show cause and again, I believe that under the *Metiom*

2   case that I cited.

3        And similarly, I think that -- well frankly, I think

4   that the *GHR* case that Mr. Wander cited went way too far on the

5   notion that the debtor can't take discovery in respect of

6   potential litigation, as I think the judge actually acknowledged

7   in his own opinion even though he still ruled against the

8   debtor.

9        I think the rule in this Circuit is much broader and

10  in many ways is ameliorated here because the debtors are taking

11  it under the Federal Rules.  I mean the Federal Rules actually

12  only apply if there's an adversary proceeding.  There's no

13  adversary proceeding.  So if you're actually going to follow the

14  plain meaning rule, *Collier* is wrong and Judge Glennon was wrong

15  in *GHR*.  But I don't think we're even at the point where they're

16  in any shape to file a lawsuit at this point.

17        MR. WANDER:  Thank you, Your Honor.

18        THE COURT:  Okay.  Thank you.

19        (Whereupon, the matter concluded at 11:18 a.m.)

20                         - o0o -

21

22

23

24

25

1                              CERTIFICATION

2

3          I, Linda Ferrara, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter.

6    Dated:   July 11, 2010

7

8

9                              Signature of Approved Transcriber

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25