**KEVIN G. MCMORROW**
45 Hill Park Avenue
Great Neck, New York 11021
(516)426-8877

**PENACHIO MALARA, LLP**
235 Main Street, Suite 600A
White Plains, NY 10601
(914) 946-2889

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

―――――――――――――――――――――――――――――

In  Re:

RICHARDS CONDITIONING CORP.

                    Debtor,

RICHARDS CONDITIONING CORP.

         Plaintiff,

         -against-

F.J. SCIAME CONSTRUCTION CO., INC., COOPER UNION
FOR THE ADVANCEMENT OF SCIENCE AND ART,
JONATHON ROSE COMPANIES LLC, AND "JOHN DOE
ONE" THROUGH "JOHN DOE TEN"
         Defendants.

**COMPLAINT IN
ADVERSARY
PROCEEDING**

Chapter 11
Case No. 09-  22525 (RDD)

―――――――――――――――――――――――――――――

**COMPLAINT IN ADVERSARY PROCEEDING FOR FRAUDELANT TRANSFERS, AVOIDABLE
TRANSFERS, PREFERENCE, BREACH OF CONTRACT, MISREPRESENTATION, BAD FAITH,
BREACH OF DUTY, VIOLATION OF AUTOMATIC STAY, FRAUD, UNJUST ENRICHMENT,
QUANTUM MERUIT, BREACH OF LIEN LAW AND CONVERSION**

1

Plaintiff, **Richards Conditioning Corp.** ("Debtor") alleges by and through its special construction counsel, the Law Offices of Kevin G. McMorrow, and its Debtor counsel, Penachio Malara, LLP, as follows:

## JURISDICTION AND VENUE

1.      This is an adversary proceeding brought pursuant to Bankruptcy Rule 7001 (1), 11 USC §544(b), 11 USC §547, 11 USC §548 and 11 USC §550. This is a core proceeding under 28 USC §157 (b)(2)(E) and (H). Jurisdiction of this Bankruptcy Court over this instant adversary proceeding is based upon 28 USC §157(a) and §1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States Bankruptcy Court for the Southern District of New York (Ward, Acting C.J.) dated July 10.1984.

2.      This complaint is brought under Sections 105, 541, 542, 544, 547, 548, 549 and 550 Chapter 11 of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and the general equitable powers of the Bankruptcy Court.   It is also brought under New York Debtor Creditor Law.

3.      This complaint is also brought under Rules 7001 <u>et seq.</u> of the Federal Rules of Bankruptcy Procedure and applicable Local Rules promulgated for this jurisdiction.

4.      Venue of this action is proper in the Bankruptcy Court in this District pursuant to 28 U.S.C. § 1409(a).

5.      This adversary proceeding relates to the matter of Richards Conditioning Corp., Case No: 09-22525 RDD currently pending under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, Westchester ("Bankruptcy Case").

## PARTIES

6.      Plaintiff, RICHARDS CONDITIONING CORP. (hereinafter referred to as the "Debtor") is the Debtor and Debtor in possession in Case No:. 09-22525 (RDD), presently pending before this Court.

7.      The Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code with the Clerk of this Court on April 6, 2010 (hereinafter referred to as the "Bankruptcy Filing") and automatic stay was issued by the Bankruptcy Court.

8.      Debtor is primarily engaged as a subcontractor providing heating and ventilation services to General Contractors and owners of property.

9.      Debtor is a New York Corporation with offices located at 70 Marbledale Road, Tuckahoe, NY 10707.

10.      Since the filing, the Debtor has continued the management of its business as Debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

11.      No official committee of unsecured creditors or other statutory committee and no trustee have been appointed in this case. For many years prior to its Chapter 11 filing, including the period from April 7, 2007 to April 6, 2009, the Debtor was insolvent.

12.      Upon information and belief,  F.J. Sciame Construction Co., Inc.   ("Sciame") is at all relevant times hereinafter mentioned, a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 14 Wall Street, New York, New York 10005.

13.     Upon information and belief Cooper Union for The Advancement of Science and Art ("Cooper Union") is, at all relevant times hereinafter mentioned, a non-profit Corporation, duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 30 Cooper Square, 8th Floor, New York, New York 1003-7120.

14.     Cooper Union was and still is the owner or the lessee under a lease with the City of New York of the premises known as 7 East 7th Street, New York, New York, Block 544, Lot 76. , and has its principal place of business at 200 E. Randolph Street, Chicago, IL 60601.

15.     That at all times hereinafter stated, upon information and belief, the defendant, FIDELITY & DEPOSIT COMPANY OF MARYLAND (thereinafter "Fidelity and Deposit") at all relevant times hereinafter mentioned, is a foreign corporation, authorized by the Superintendent of Insurance to conduct the business of insurance and suretyship in the state of New York and has it principal place of business located at 1400 American Lane, Schaumburgh, IL 60196.

## <u>RELEVANT INDIVIDUALS</u>

16.     Upon information and belief Frank J. Sciame ("Frank Sciame") is or was an officer of Sciame and is a resident of the State of New York.

17.     Upon information and belief Joseph Mizzi ("Mizzi") is or was a principal and President of Sciame and is a resident of the State of New York.

18.     Upon information and belief Steven Colletta ("Colletta") is or was Vice President of Sciame and is a resident of the State of New York.

19.     Upon information and belief Robert DaRos ("DaRos") is or was an employee of Sciame and is a resident of the State of New York.

20.     Upon information and belief, Jason Smith ("Smith") is or was an employee of Sciame and is a resident of the State of New York.

21.     Upon information and belief, Darren McIntyre ("McIntyre") is or was an employee of Sciame and is a resident of the State of New York.

22.     Upon information and belief Lawrence Lee ("Lee") is or was an employee of Sciame and is a resident of the State of New York.

23.     Martin M. Hopwood Jr. ("Hopwood") is a principal of the Debtor.

24.     Richard J. Hopwood ("R. Hopwood") is a principal of the Debtor.

25.     Lawrence P. Hopwood ("L. Hopwood") is a shareholder of the Debtor.

26.     Upon information and belief, Sarah Hagan ("Hagan") is or was an employee of Jonathon Rose and is a resident of the State of New York.

27.     Upon information and belief, David Marino ("Marino") is or was an employee of Allied and subsequently Aon and is a resident of the State of New York.

## INTRODUCTORY FACTS AND DOCUMENTS

28.     Upon information and belief, Sciame entered into a Construction Management contract with Cooper Union ("Sciame Cooper Union Contract") to perform the preconstruction work for New Academic Building for Cooper Union at 41 Cooper Square, Block 462 Lot 1, in the County of New York Borough of Manhattan, State of New York ("Cooper Union Project") and upon approval of a final budget, to perform the HVAC Work on the Cooper Union Project.

29.     On or about November 8, 2006, the Debtor received a Letter of Intent from Sciame awarding to the Debtor a contract for the HVAC Work on the Project for the amount of $14,187,000.00 ("Letter of Intent").  A copy of the Letter of Intent is attached hereto as **Exhibit A** and made a part hereof.

30.     Upon information and belief, Sciame, and the Debtor entered into a contract dated as of November 8, 2006 ("Sciame Debtor Contract") pursuant to which the Debtor agreed to perform certain heating, ventilating and air conditioning work at the Cooper Union Project ("HVAC Work"). A copy of the Sciame Debtor Contract is included in **Exhibit A** and made a part hereof.

31.     Upon information and belief on or before March 25, 2009, Sciame and the Debtor entered into an agreement with respect to certain change orders and claims of the Debtor ("Change Order Agreement").  A copy of the Change Order Agreement is attached hereto **Exhibit B** and made a part hereof.

32.     Upon information and belief, Steadfast Insurance Company ("Steadfast") issued Sub Guard Insurance Policy No. SGD9141782 ("Sub Guard Insurance Policy") for Sciame for the Cooper Union Project, pursuant to which Steadfast agrees to indemnify Sciame or Cooper for costs and expenses paid by it to the extent caused by a default of performance of a subcontractor/supplier under the terms of a subcontract or purchase order agreement.

## THE DEBTOR'S PRIOR WORK HISTORY WITH  SCIAME

33.     On or about February 1, 2003 Sciame and the Debtor entered into a contract to perform certain HVAC work at Sarah Lawrence College, Bronxville New York 10708 ("Sarah Lawrence Contract").

34.     The Debtor was the low bidder on such Project and was so advised by Mark Heiman of Sciame. Heiman was an employee of Sciame at that time.

35.     The Debtor had a dispute under the Sarah Lawrence Contract with Sciame and the Architect and Engineer for such Project as a result of the negligent design and engineering of the plans and specifications.

36.     The Debtor and Sciame resolved the dispute and the Debtor was paid an additional amount by Sciame under the Sarah Lawrence Contract as a result of the dispute resolution.

37.     In addition, the Debtor performed corrective work directly for Sarah Lawrence College and was paid by the owner for such corrective work.

38.     On or about February 2006, Hopwood advised DaRos and Frank J. Sciame of Sciame that even after the settlement payment, the Debtor had lost a substantial amount of money under the Sarah Lawrence Contract due to the dispute.

39.     On or about December 13, 2005, the Debtor entered into a contract with Sciame to perform certain HVAC work at the offices of GE Consumer Finance, located at 777 Long Ridge Road, Stamford Ct. 06902 ("GE Contract").

40.     Upon information and belief, the Debtor replaced a New York City Contractor that had initially contracted with Sciame to perform such work. The Debtor was awarded the contract because its bid was substantially lower than the New York City Contractor.

41.     The work under the GE Contract was substantially completed on or about May 2006.

42.     During the course of the GE Contract, the Debtor encountered substantial cash flow issues as a result of the accelerated schedule required by Sciame under the GE Contract.

43.     The Sarah Lawrence Contract and GE Contract commenced prior to the date the Debtor was solicited to bid the HVAC Work for the Cooper Union Project.

## COOPER UNION BID SOLICTATION BY SCIAME

44.     On or about January 2006, DaRos contacted Hopwood and requested that the Debtor prepare an estimate for the HVAC Work for the Cooper Union Project.

45.     DaRos advised the Debtor that the HVAC portion of the work for the Cooper Union Project had a value of approximately $10,000,000.

46.     DaRos solicited the Debtor's bid stating it was the Debtor's opportunity to perform large contract mechanical work in New York City.

47.     In addition, DaRos advised the Debtor that it wanted the Debtor to bid the project because the Debtor had completed the Sarah Lawrence Contract despite losses to the Debtor resulting from bidding and design issues.

48.     On or about February 2006, DaRos of Sciame sent the plans and specifications to the Debtor.

49.     Upon information and belief, prior to soliciting a bid from the Debtor for the HVAC Work at the Cooper Union Project, Sciame had solicited bids for the Cooper Union Project from other qualified HVAC Contractors and presented a budget for the Cooper Union Project to Jonathan Rose and Cooper Union.

50.     Upon information and belief, prior to soliciting a bid from the Debtor for the HVAC Work at the Cooper Union Project, the concrete contractor that provided a bid to Sciame for the concrete structure for the Cooper Union Project withdrew its bid.

51.     Upon information and belief, as a result of the withdrawal by the concrete contractor of its bid for the Cooper Union Project, the replacement contactor's bid was approximately $10,000, 000 more than the initial concrete contactor's bid for the Cooper Union Project.

52.     Upon information and belief, Sciame, Cooper Union, Jonathan Rose and their officers, agents, representatives and employees intentionally solicited a bid from the Debtor, because the Cooper Union Project was over budget.

53.     In addition, upon information and belief, Sciame, Cooper Union, Jonathan Rose and their officers, agents, representatives and employees intentionally solicited a bid from the Debtor, because the Debtor was not a New York City Contractor and had a history with Sciame of underbidding projects with Sciame.

## COOPER UNION BID

54.     On or about February 2006, the Debtor submitted its initial Proposal to Sciame for the HVAC work to be done at the Cooper Union Project.

55.     Sciame required that the proposal from the Debtor include detailed line items for trades and major equipment.

56.     Upon information and belief, Sciame required that the proposal from other qualified bidders for the HVAC work contain detailed line items.

57.     Upon information and belief, Sciame obtained bids by trade from single trade contractors and multiple trade contractors for portions of the HVAC work.

58.     Upon information and belief, Sciame obtained bids from major equipment suppliers for portions of the HVAC work.

59.     DaRos, of Sciame, advised the Debtor that a detailed line item proposal was required to compare scopes with other bidders and to determine if the bidder had made a mistake.

60.     The initial proposal submitted by the Debtor had multiple line items for labor, material and equipment.

61.     The initial proposal included, among others, detailed line items for "Spiral Duct Fittings and Transitions", "Sheet Metal Labor - Materials, Drawings" and Steamfitting – Labor, Materials, Drawings.

62.     After the Debtor submitted its initial proposal to Sciame, Sciame asked the Debtor to participate in suggesting and pricing value engineering of certain items of HVAC work to reduce the cost of the HVAC Work for the Cooper Union Project.

63.     Upon information and belief, the Debtor's initial bid was more than $3,000,000 less than the next lowest bidder.

64.     The Debtor was advised by DaRos that it was not the lowest bidder after submitting its initial proposal.

65.     Upon information and belief, DaRos made his various misrepresentations intentionally to induce the Debtor.

66.     From February 2006, to November 2006, the Debtor and its officers, agents, representatives and employees met numerous times with representatives of Sciame, Cooper Union, Jonathon Rose and their officers, agents, representatives and employees.

67.     The Debtor and its officers, agents, representatives and employees, specifically discussed with Sciame, Cooper Union, Jonathan Rose and their officers, agents, representatives and employees critical items that the Debtor did and did not include in its bid and value engineering items.

68.     Those meetings were held to discuss the Debtor' proposal for the HVAC work to be conducted on the Project.

69.     During those meetings Hopwood repeatedly asked Sciame and its officers, representatives and employees whether the Debtor submitted the lowest bid for the HVAC Work on the project.

70.     The Debtor worked with DaRos and other consultants and representatives of Sciame, Jonathan Rose and Cooper Union too determine the savings or increases from the value engineering requests from Sciame.

71.     As part of the value engineering, the Debtor was asked to propose a credit to eliminate all Stainless Steel ductwork and replace with galvanized duct work.

72.     The Debtor gave a proposed credit of less than $80,000 to eliminate the "SS ductwork and replace with galvanized".

73.     During the value engineering period, the Debtor attended a scope review meeting with representatives and consultants of Sciame, Jonathan Rose and Cooper Union.

74.     Hopwood specifically asked the Cooper Union's mechanical engineer at the scope review meeting whether the stainless steel value engineering deduct item was going to be requested and he advised those present at the meeting it was not going to be selected because our value engineering deduct for such item was a less than other qualified HVAC contractors.

75.     Upon information and belief, Sciame, Jonathan Rose and Cooper Union reviewed all value engineering pricing and the Debtor's proposals.

76.     Upon information and belief, Sciame obtained proposals from other qualified HVAC contractors for the value engineering items proposed by Sciame.

77.     The Debtor was falsely and intentionally advised by DaRos after the value engineering analysis was completed and after submitting its final proposal that it was not the lowest bidder.

78.     Upon information and belief, before issuing the Letter of Intent to the Debtor, Sciame, Jonathan Rose and Cooper Union analyzed the line item detail and knew that the Debtor had substantially underbid the HVAC work for the Cooper Union Project or made a mistake.

79.     Upon information and belief, Sciame, Jonathan Rose and Cooper Union had full knowledge that the Debtor had made substantial mistakes in its proposal.

80.     Upon information and belief, Sciame, Jonathan Rose and Cooper Union intentionally disregarded the substantial mistake in the Debtor's proposal.

81.     Sciame, Jonathan Rose and Cooper Union had a duty to inform the Debtor of its mistakes in the bid.

82.     Sciame, Jonathan Rose and Cooper Union failed to inform the Debtor of its mistake in its initial and final proposals before the Letter of Intent was issued and the Debtor had commenced the HVAC Work.

83.     Sciame and its officers, representatives and employees repeatedly advised the Debtor and the Debtor' officers, agents, representatives and employees that they were not the lowest bidder for the HVAC work on the Project.

84.     The Debtor and its officers, representatives and employees advised Sciame and its officers, representatives and employees that the Debtor would not conduct the HVAC work for the Cooper Union Project if the Debtor was the lowest bidder for the HVAC work.

85.     The Debtor and its officers, representatives and employees were advised by Sciame and its officers, representatives and employees that another HVAC contractor submitted a bid lower than the Debtor's bid and that there other qualified contractors submitted bids for the HVAC work only slightly higher than the Debtor's bid.

86.     Sciame and its officers, representatives and employees advised the Debtor that not only were they not the lowest bidder but that the Debtor should decrease its bid by approximately $100,000 in order for Sciame to award the Debtor the HVAC work on the Project because there were other qualified competitors.

87.     The Debtor and its officers, representatives and employees relied upon the information provided by Sciame and its officers, representatives and employees and lowered its bid for the HVAC work on the Project.

88.     Upon information and belief, Sciame, Cooper Union and Jonathan Rose intentionally selected the Debtor to perform the HVAC Work for the Cooper Union Project because the Debtor was the lowest bidder.

89.     Upon information and belief, at the time that Sciame, Cooper Union and Jonathan Rose selected the Debtor to perform the HVAC Work for the Cooper Union Project.  Sciame, Cooper Union and Jonathan Rose knew that the Debtor was unqualified to perform such work in accordance with the items of HVAC Work to be performed and the schedule to complete such HVAC work required under the Sciame Cooper Union Contract.

90.     Upon information and belief, Sciame, Cooper Union and Jonathan Rose added a line item contingency in the final budget submitted to Cooper Union to partially cover the mistakes in the Debtor's proposals resulting in an underbidding by the Debtor.

91.     Further, upon information and belief, Sciame, Jonathan Rose and Cooper Union selected the Debtor to perform the HVAC Work for the Cooper Union Project because without the substantial decrease in the budget resulting from the Debtor's low bid the Cooper Union Project would not have proceeded to the Construction phase.

92.     The Debtor advised Sciame that the Debtor would not be able to bond the HVAC Work if it were awarded the contract because it was above its single project bonding limit.

93.     On or about September 2006, the Debtor was advised by Sciame through DaRos that the Debtor had been prequalified by Sciame for coverage under the Sub Guard Policy.

94.     The Debtor relied on the fact that it met the prequalification standards and interpreted this prequalification that the representation about the Debtor's bid by Sciame were accurate.

95.     Upon information and belief, Marino of Allied was the insurance agent that obtained the Sub Guard Policy from Steadfast on behalf of Sciame the Sub Guard Policy.

96.     Upon information and belief, in order for subcontractor to be prequalified for coverage under the Sub Guard Policy, the subcontractor must meet the prequalification standards established by Sciame and Allied.

97.     Upon information and belief, the Debtor and its proposal did not meet these prequalification standards.

98.     By soliciting bids for the Cooper Union Project; Sciame, Jonathan Rose and Cooper Union represented and warranted to the Debtor that they have an implied obligation and duty to the Debtor to, furnish plans and specifications that are complete, suitable, and accurate; equitably adjust the contract price to account for extra and changed work as well as suspensions and delays of work caused or ordered by Sciame or Cooper Union; recognize and remedy any deficiencies in the plans, specifications and contract documents; provide proper and timely interpretation of plans and specifications, promptly issue change and extra work orders to memorialize the performance of changed and extra work; promptly recognize and grant time extensions to reflect additional time allowable under the contract and permit concomitant adjustments in scheduled performance; and exercise control over and coordinate the work of the contractors under direct contract with an owner to insure that the Debtor's work is not delayed or disrupted.

## LETTER OF INTENT FROM SCIAME

99.     On or about November 8, 2006, the Debtor received the Letter of Intent from Sciame.

100.    The Letter of Intent did not include all the terms and conditions of the Contract.

101.     As of November 8, 2006, the Debtor had not received a full copy of the Sciame Cooper Union Contract.

102.     Immediately prior to receiving the Letter of Intent, the Debtor was again advised by Sciame and its officers, representatives and employees that the Debtor was not the lowest bidder for the HVAC Work on the Project and that other contractors submitted bids below the Debtor' bid.

103.     On or about December 2006, The Debtor commenced its preparation of coordination drawings and submittals for the HVAC Work for the Cooper Union Project.  During this time the Debtor met with Sciame and its representatives to discuss the preparation of the drawings and submittals.

104.     During the meetings between the Debtor and Sciame regarding the preparation of coordination drawings and submittals for the HVAC Work for the Cooper Union Project, discrepancies and ambiguities involving the fabrication and installation of certain HVAC materials were discovered in the architectural and engineering drawings and specifications.

105.     The Debtor advised Sciame and its representatives of the discrepancies and ambiguities.

106.     DaRos and Smith acknowledged the discrepancies and ambiguities and advised the Debtor that it would instruct Jonathan Rose and Cooper Union to approve change orders to the Debtor for the discrepancies and ambiguities in the plans and specifications.

107.     Sciame acknowledged that Sciame, Cooper Union and Jonathan Rose knew that the Debtor had not included the work required by these discrepancies and ambiguities in its bid to Sciame.

108.   The Debtor advised Sciame that the discrepancies and ambiguities in the plans and specifications would substantially increase the cost of performing the HVAC Work and the time to perform such work.

109.   After learning of the discrepancy in the plans and specifications for the Cooper Union Project, the Debtor again asked DaRos, Colletta and other representatives, employees and agents whether the Debtor submitted the lowest bid for the HVAC work on the Project.

110.   The Debtor advised Colletta that its sheet metal fabrication shop did not have the equipment necessary to fabricate some of the sheet metal required by Cooper Union as a result of its interpretation of the ambiguous plans and specifications.

111.   DaRos, Colletta and Sciame's representatives, employees and agents again advised the Debtor that it was not the low bidder for the HVAC work on the Project and that other contractors submitted lower bids.

112.   The Debtor relied upon the statements made by DaRos and Colletta and Sciame's representatives regarding the representation that the Debtor was not the lowest bidder when deciding whether to move forward with the HVAC Work for the Cooper Union Project in April 2008. The Debtor's reliance upon this representation was reasonable.

113.   Thereafter, the Debtor and Sciame conducted additional meetings regarding the Debtor's proposal for the Project.  During these meetings, the Debtor was shown a complete copy of the Sciame Cooper Union Contract.

114. Within the Sciame Cooper Union Contract, there was a line item added for a "low bid contingency" to the Debtor's bid breakdown.

115. When the Debtor asked Colletta a question why there was a line item in the Sciame Cooper Union Contract for a low bid contingency, Colletta insisted that the Debtor return the full copy of the Sciame Cooper Union Contract to him immediately.

116. The Debtor was never given a full copy of the Sciame Cooper Union Contract or the reasonable opportunity to review a full copy of the Sciame Cooper Union Contract.

117. Based on this information, the Debtor again questioned Sciame as to whether the Debtor was the lowest bidder on the Project for the HVAC work and whether the Debtor's bid was comparable to other contractors.

118. Again, Colletta advised the Debtor that it was not the lowest bid and that other contractors submitted lower bids.

119. Hopwood advised Colletta that if it was the lowest bidder, or if there were no comparable bids by other contractors, then the Debtor would need to re-evaluate whether it would agree to execute the final agreement for the HVAC Work on the Project.

120. Thereafter, Colletta again advised Hopwood that it did not submit the lowest bid for the HVAC Work for the Cooper Union Project.

121.    Further, Colletta advised Hopwood that the Debtor was a low bid contingency on the Cooper Union Project, because the Debtor was a new contractor in New York City and unfamiliar with the local trade unions.

122.    Colletta told Hopwood that it was not in Sciame's interest to employ a contractor that could not complete the work.

123.    Upon information and belief, Colletta intentionally made various misrepresentations to induce the Debtor.

124.    The Debtor reasonably relied upon Colletta's misrepresentations.

125.    Based on Sciame's statements and representations that the Debtor did not submit the lowest HVAC bid for the Cooper Union Project, the Debtor moved forwarded with additional meetings with Sciame for the Cooper Union Project.

126.    Thereafter, The Debtor received a fully executed copy of the Sciame Debtor Contract.

## COOPER UNION PROJECT DELAYS

127.    The Cooper Union Project was scheduled to commence in January of 2008.  However, numerous delays involving the foundation of the building, the initial concrete contractor, curtain wall contractor, sidewalk elevator, union issues and scheduling issues caused the Cooper Union Project to immediately fall behind schedule more than three months.

128.     As a result of the initial delays in the Cooper Union Project, Sciame accelerated the work schedules agreed to by the parties in the Sciame Debtor HVAC Contract.  The acceleration of the HVAC Work was a breach of the terms and conditions of the Sciame Cooper Union Contract.

129.     The Debtor was not able to commence work on site at the Cooper Union Project as scheduled because of such delays.

130.     On or about October 2008, the Debtor submitted a change order to Sciame for the work regarding the discrepancies and ambiguities in the original plans and specifications for the Cooper Union Project.

131.     Upon information and belief, Sciame, Cooper Union and Jonathan Rose, and its officers, representatives and agents knew from the conception of the Cooper Union Project that the Debtor's bid for the HVAC work on the Project was substantially below all other parties.

132.     Upon information and belief Sciame and its officers, representatives and agents prepared memorandum(s) and had meetings with Jonathan Rose and Cooper Union regarding the fact that the Debtor's bid for the HVAC work on the Project was over $2 million lower than the other bids.

133.     For over two years, Sciame and its officers, representatives and agents continuously advised the Debtor that it was not the lowest bidder for the HVAC work on the Project.

134.     The Debtor repeatedly advised Sciame of its concerns regarding its bid over a two year period. Moreover, the Debtor advised Sciame that it would not move forward on the Project if it was the low bidder.

135.    Sciame continually made representations and statements to the Debtor that it was not the low bidder for the HVAC work on the Project.  The Debtor relied upon those statements and representations when agreeing to move forward on this Project and in signing the Settlement Agreement.

## FW SIMS AND SCIAME
## OVERBILLING AND OVERCHARGING

136.    On or about December 2008, Summit Mechanical contacted the Debtor at the direction of Sciame to inquire whether they could perform all or a portion of the Steamfitting Work as a subcontractor of the Debtor.

137.    Upon information and belief, Summit Mechanical had performed work for Sciame at another project in New York City and had been advised by Sciame to contact the Debtor.

138.    In addition, at about the same time, Sciame contacted the Sims and Alfa Piping Corp., without the knowledge of the Debtor. Sims previously performed work for Sciame at other projects in New York and had originally bid the HVAC work for the Cooper Union Project to Sciame.

139.    Alfa Piping was a subcontractor of Sciame at a project at St. John's University.

140.    On or about October 2008, Sciame threatened to declare the Debtor in default unless the Debtor subcontracted out a certain part of the HVAC work ("Steamfitting Work"). As a result of this threat, the Debtor entered into contracts with Summit Mechanical and Alfa Piping Corp. to perform certain Steamfitting Work for a fixed price.

141.    In addition, the Debtor received quotes on January 6, 2009, to perform specific Steamfitting Work from the Sims, including the installation of the piping for radiant floor panels. The quote for this work

was directly obtained from Sims by Sciame. The quotes were substantially in excess of other quotes the Debtor had received from Summit Mechanical and Alfa Piping.

142. The Debtor proved that the Defendant's estimates of labor and material were unreasonably high.

143. However, DaRos of Sciame advised Hopwood, that Mizzi wanted the Debtor to give work to Sims.

144. The Debtor entered into purchase order #5153-2640 dated January 9, 2009 for an amount equal to $175,000 ("Radiant Ceiling Fixed Price Contract") to perform certain radiant ceiling work.

145. Immediately after entering into the Radiant Ceiling Fixed Price Contract, the Debtor discovered by accident that Sciame was talking to Sims to complete all of the unfinished Steamfitting Work.

146. On January 18, 2009, Sciame demanded that the Debtor bring in another steamfitting contractor to complete all of the unfinished Steamfitting Work for the Cooper Union Project and lay off all steamfitters employed by the Debtor.

147. The Debtor attempted to obtain fixed prices to complete such Steamfitting work and the Debtor was initially advised that it had 10 days to competitively bid such work and select a contractor or contractors.

148.     At this time the general construction market in New York City had slowed dramatically and the Debtor could have obtained competitive fixed pricing to complete the unfinished steamfitting work in whole or in part from one or more qualified steamfitting contractors.

149.     Subsequently, on or about January 22, 2009, the Debtor was in the process of obtaining competitive fixed price proposals to complete the work from Alfa Mechanical and Panava Mechanical.

150.     Upon information and belief, at the same time, Sciame then unilaterally mandated that the Debtor they must accept a time and material bid from Sims or it would declare the Debtor in default.

151.     Upon information and belief, the time and material bid from Sims had already been negotiated by DaRos. Colletta told the Debtor that it would not process the pending change order unless the Debtor entered into the time and material contract with Sims.  The Debtor was also advised by a Local 638 business agent to use only one contractor to complete the Steamfitting work.

152.     On or about January 23, 2009, the Debtor sent a proposed Purchase Order to Sims including labor rates that the Debtor used under the Sciame Debtor HVAC Contract.

153.     Thereafter, the Debtor received a counter-proposal from Sims substantially changing the terms including the labor rates paid by Sims to its employees.

154.     On or before January 23, 2009, Joseph Simonelli of Sims advised Hopwood that Sims did pay all his men the premium of $13.50 per hour over the Local 638 contract wages and benefits.

155.     In response, Hopwood advised Simonelli that the Debtor would be requiring certified payrolls to prove that Sims paid the $13.50 premium to its employees.

156.     The Debtor expressed outrage to DaRos over the excessive premium that Sims allegedly paid its Steamfitter employees.

157.     DaRos represented to Hopwood that Sims paid all their Local 638 employees a premium above the Local 638 contract rates for wages and benefits in order to get the more experienced and performing workers.

158.     DaRos made this representation intentionally to Hopwood to induce the Debtor. Hopwood and the Debtor reasonably relied upon the representations of DaRos.

159.     Hopwood had a direct conversation with Simonelli and specifically asked him if he really paid the excessive premium to his Local 638 employee workers, in addition to a fixed hour of overtime 4 days per week.

160.     Simonelli advised Hopwood Sims did pay all his men the premium over the Local 638 contract wages and benefits of $13.50. Hopwood advised Mr. Simonelli the Debtor would be requiring certified payrolls.

161.     Before the Debtor had finalized the terms or executed a contract with Sims, Sims at the direction of Sciame sent men and material to Cooper Union Project site to commence the remaining Steamfitting Work.

162.     The Debtor issued Purchase Order # 5153-2640B, on or about January 23, 2009, to Sims to complete the unfinished Steamfitting Work on a time and material basis.

163.     The limited certified payrolls provided to date by Sims indicate that except for the principals of Sims, Sims did not pay the $13.50 premium to its employees as indicated in the wages and benefits schedule attached to the Time and Material Contract or as shown on Invoices submitted to the Debtor and Sciame.

164.     Upon information and belief, by overbilling and overcharging the Debtor, Sims received an additional profit of more than $13.50 per hour for more than 29,000 hours during the period from the date of the Time and Material Contract through August 2010, plus 10% for overhead and 5% for profit on such overbilling and overcharging.

165.     Upon information and belief, Sciame knew that Sims was intentionally overbilling and overcharging the Debtor more than $567,951.08.

166.     Upon information and belief, Sciame in collusion with Sims intentionally deceived and misrepresented to the Debtor that the $13.50 premium was to be paid to all employees to hide the fact that Defendant was making and additional 14% in profit over and above the 5% permitted pursuant to the Time and Material Contract.

167.     The Debtor contacted Robert DaRos by e-mail on February 10, 2009, stating that (1) the employees of the Sims were not paid the $13.50 Premium, (2) a principal was billing for his time and (3) Sims billed the Debtor for mobilization, on a weekend, which was not authorized by the Debtor.

168.     Robert DaRos of Sciame responded to this e-mail acknowledging that Sciame knew Sims was not paying its employees the $13.50 Premium and that the Debtor should not raise these issues, reminding the Debtor that Sciame was processing more than $2,000,000.00 on change orders plus impact costs for the Debtor.

## SUB-GUARD INSURANCE CLAIM

169.     On or about February 27, 2009, McIntyre of Sciame authorized the Debtor and its subcontractors to perform HVAC Work on an overtime basis at the cost and expense of Sciame.

170.     On or about March 8, 2009, Hopwood met with DaRos and Colletta to discuss the status of the Debtor and the status of the HVAC work.

171.     At such meeting, Hopwood advised DaRos and Colletta that it would be filing bankruptcy in the next 30 days.

172.     Further, Hopwood advised DaRos and Colletta that it had substantial change orders, delay claims and claims for impact costs against Sciame under the Sciame Debtor Contract.

173.     Colletta advised Hopwood that litigation would be protracted and costly and suggested an alternative solution.

174.     Colletta stated, in sum and substance, that he would "trigger" the Sub-Guard Insurance Policy to cover the additional cost and expenses.

175.     Colletta stated that in order for it to cover the additional costs and expenses to complete the HVAC Work within the schedule for the Cooper Union Project, Sciame would declare the Debtor in default and state to Steadfast the insurer under the Sub Guard Policy that the Debtor was responsible for the additional costs and expenses.

176. Colletta stated that the Sub-Guard Policy would not cover costs which were the obligation of Sciame and/or Cooper Union and therefore he had to make the Debtor responsible.

177. Colletta proposed that it would seek to obtain as many of the change orders as it could from Cooper Union in the next 30 days.

178. Colletta further proposed that the Debtor agree to being declared in default by Sciame so that all the additional costs and expenses of completing the HVAC work within the time schedule required by Cooper Union would be paid for under the Sub Guard Policy.

179. Colletta advised the Debtor that Sciame had a $500,000 deductible under the Sub-Guard Insurance Policy.

180. Colletta advised the Debtor that Sciame had to pay 20% of any costs paid out under the Sub-Guard Insurance Policy in excess of $2,000,000.

181. Colletta proposed that Sciame would pay all amounts due to the Debtor's vendors and suppliers that remained outstanding when the Debtor was declared in default.

182. Colletta proposed that Sciame would agree to allow the Debtor to remain in charge of the overall coordination of the HVAC Work, including the work being performed by Sims.

183. Colletta proposed that Sciame would permit the Debtor to continue to fabricate and install the sheet metal work portion of the HVAC Work, perform the start-up of all equipment and maintain its existing subcontractors.

184.    Colletta proposed that Sciame would pay the Debtor for all out of pocket costs and expenses for the performance of such Sheet Metal Work and equipment start up work from the date of the meeting forward.

185.    The Debtor reasonably relied upon these various representations and statements.

## **CHANGE ORDER AGREEMENT**

186.    Colletta stated that he would prepare an agreement setting forth the proposals from Sciame.

187.    On or about March 24, 2009, the Debtor was advised by Sciame that Jonathan Rose and Cooper Union would only approve change orders under strict guidelines.

188.    As stated above, the Debtor was contemplating filing Chapter 11 bankruptcy protection and had no negotiating leverage with Sciame, Jonathan Rose and Cooper Union.

189.    On or about March 24, 2009, Hopwood notified Colletta at Sciame that it could not agree to the schedule contained in the Change Order Agreement, because it would require overtime which was the responsibility of Sciame.

190.    On or about March 25, 2009, Colletta advised Hopwood that unless the schedule and the requirements for overtime were included in the Change Order Agreement, then the recovery of the overtime costs to complete on the Schedule set forth in the Change Order Agreement, it could not be covered under the Sub-Guard Policy.

191.     Sciame advised the Debtor that if the Debtor did not execute the Change Order Agreement, releasing Sciame and Cooper Union of all claims, then the Debtor would not honor its proposals, it would terminate the Debtor and it would not receive payments for any change orders.

192.     Upon information and belief, at the time the Change Order Agreement was executed and delivered Sciame was aware that there were unpaid vendors of the Debtor.

193.     Upon information and belief, trust funds (as defined under the New York Lien Law) received by Sciame from Cooper Union were used to pay for costs and expenses which were not "cost of improvements" as defined in the New York Lien Law.

194.     Upon information and belief the New York Lien Law provides that all funds paid to an Owner, a contractor, or a subcontractor for the improvement of private or public real property constitute trust funds pursuant to Article 3A of the New York Lien Law.

195.     Upon information and belief, Cooper Union, as part of the costs of the Cooper Union Project, agreed to pay for the cost of obtaining the Sub-Guard Policy.

196.     Upon information and belief, the Sub-Guard policy was in essence a contingent financing in part of "cost of improvements" for the Cooper Union Project.

197.     Upon information and belief, Sciame was paid for "cost of improvements" for the Cooper Union Project from the proceeds of the Sub-Guard Policy.

198.     Upon information and belief, Sciame was paid for cost and expenses from the Sub-Guard Policy for the Cooper Union Project which were not "cost of improvements".

199.     Upon information and belief at the time that Sciame was paid for cost and expenses which were not "cost of improvements" trust fund claimants for the Cooper Union Project including the Debtor remained unpaid.

200.     Upon information and belief, Sciame reimbursed itself for the deductibles under the Sub-Guard Policy from trust fund proceeds received by Sciame from Cooper Union.

201.     Upon information and belief, Sciame reimbursed itself for costs and expenses for the Cooper Union Project which were not "cost of improvements" before all trust fund claimants for the Cooper Union Project had been paid in full.

## BANKRUPTCY FILING AND VIOLATION OF STAY

202.     Thereafter, The Debtor did file a petition for bankruptcy on or about April 6, 2009.

203.     On or about April 6, 2009, the Notice of Bankruptcy Case filing was sent to Sciame.

204.     Immediately following the Debtor's Bankruptcy filing, Sciame refused to honor its commitments to pay the Debtor for (i) the costs and expenses of all labor and materials incurred by the Debtor in performing HVAC Work from March 8, 2009 till the completion of the Cooper Union Project, (ii) Sciame assumed the obligations of the Debtor under the time and material contract with Sims and advised the Debtor that Sims would be coordinating and running all of the HVAC Work, (iii) Sciame sent a Notice of Termination to the Debtor of the Sciame Debtor HVAC Contract and (iv) violated the Stay.

205.     On or about April 7, 2009, Sciame requested that the Debtor file a "critical vendor" motion to pay certain vendors during the ordinary course to complete the Cooper Union Project.

206.     The Bankruptcy case filings provides, in pertinent part, that the "filing of the bankruptcy case automatically stays certain collection and other actions against the Debtor" and any "attempt to collect a debt or take other action in violation of the Bankruptcy Code" may be penalized ("Automatic Stay").

207.     Sciame was notified by the Debtor's Counsel of the Bankruptcy Filing and the Automatic Stay.

208.     Upon information and belief, on or about April 7, 2009, Sciame issued a Purchase Order agreeing to accept the attornment of the Time and Material Contract ("Assumption Agreement".)

209.     As of the date of the Assumption Agreement, there was a balance remaining due to the Debtor of at least $2,208,002 under the Sciame Debtor HVAC Contract plus claims for additional costs and expenses.

210.     On or about April 13, 2009, Sciame sent a notice to the Debtor allegedly terminating the Sciame Debtor HVAC Contract.

211.     On or about April 13, 2009, Debtor's counsel notified Sciame and Sciame's counsel that the Sciame notification was a violation of the Automatic Stay.

212.     The actions of Sims were a violation of the Automatic Stay, the Sciame Debtor Contract and the Change Order Agreement.

## **MECHANICS LIEN**

213.    On or about and between November 1, 2006 and June 30, 2010, the Debtor at the special insistence and request of Sciame, as subcontractors to Sciame with the knowledge and consent of Cooper Union, as Owner, provided labor, material and equipment, all in the agreed price and reasonable value of $21,852,000.

214.    Sciame was indebted to the Debtor at the time of the filing of the Notice of Lien herein. To date, Sciame has failed to pay $4,556,944.00, although same has been duly demanded by the Debtor.

215.    The Labor, materials and equipment were furnished for the improvement of the real property aforementioned and were furnished for, and were actually applied in and about, the improvement of the building on said premises, by the Debtor as subcontractor to Sciame, and with the knowledge and consent of Cooper Union, as owner.

216.    That on or about August 13, 2009 within three (3) months after providing the last item of labor, material and equipment as foresaid, the Debtor caused to be duly filed in the Office of the Clerk of the County of New York, and the same was duly entered and docketed therein, a Notice of Mechanic's Lien ("Mechanics Lien") in due form in the amount of $3,293,001.50.

217.    A copy of the Mechanic's Lien is annexed hereto as **Exhibit C,** made a part of hereof and marked.

218.    The Mechanic's Lien was served pursuant to Section 11 of the Lien Law and Proof of Service thereof was filed with the Clerk of New York County on August 19, 2009.

219.    A copy of the Affidavit of Service is included within **Exhibit C** and made a part hereof.

220.    On or about August 2, 2010 the Debtor extended its Notice of Mechanic's Lien by the filing of an Extension of Notice of Mechanic's Lien with the Clerk of the County of New York, and the same was duly entered and docketed therein.

221.    A copy of the Extension of Notice of Mechanics Lien is attached hereto as **Exhibit D** and made a part hereof.

222.    The Extension of Notice of Mechanics Lien was served pursuant to Section 11 of the Lien Law and Proof of Service thereof was filed with the Clerk of New York County on August 2, 2010.

223.    A copy of the Affidavit of Service is included within **Exhibit D** and made a part hereof. The Debtor's lien as extended is hereinafter referred to as ("Debtor's Lien").

224.    The Debtor's Lien has not been paid, cancelled, or discharged and no other action or proceeding at law or in equity has been brought by the Debtor for the foreclosure thereof, or for the recovery of the moneys thereby secured or any part thereof, or for the recovery of the moneys thereby secured or any part thereof, except in the following respects: that on the 24th day of February, 2010, a Bond numbered LPM08957938 ("Bond") in the amount of $3,622,301.65 was executed by the defendant Sciame, as principal and defendant, Fidelity, as surety.

225.    Thereafter said Bond was filed with the New York County Clerk, thereby discharging the lien of the Debtor.

226. The Mechanics Lien has not been paid, cancelled, or discharged, and no other action or proceeding at law or in equity has been brought by the Debtor for the foreclosure thereof.

227. Upon information and belief, each of the defendants names other than Fidelity, have no claim to or have an interest in, claim or lien, if any subsequent and subordinate to the lien of the Debtor.

## THE TRANSFERS

228. During the period from December 31, 2006 through March 31, 2009, the Debtor submitted Requisitions and Invoices to Sciame.

229. Upon information and belief, pursuant to the requisition and Invoice for the period ending January 31, 2009, Sciame paid or transferred to itself $569,894.30.

230. Upon information and belief, pursuant to the requisition and Invoice for the period ending February 28, 2009, Sciame paid or transferred to itself $9,522.30.

231. Upon information and belief, pursuant to the requisition and Invoice for the period ending March 31, 2009, Sciame paid to itself $457,808.33.

232. On or about March 25, 2009, Sciame and the Debtor executed and delivered the Change Order Agreement.

233. The Change Order Agreement reduced the value of claims of the Debtor by more than $1,112,372.62, plus an undetermined amount for impact costs, including overtime.

234. Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-58 as though set forth in full herein.

235. At the time of the transfers and the execution and delivery of the Change Order Agreement, the Debtor was insolvent or was rendered insolvent by virtue of the transfers or the execution and delivery of the Change Order Agreement.

236. Sciame received the transfers and accepted the execution and delivery of the Change Order Agreement without consideration in constructive fraud of the Debtor's creditors.

237. The transfers and the execution and delivery of the Change Order Agreement violated New York Debtor Creditor Law, including without limitation Article 10 - Fraudulent Conveyances.

238. Pursuant to 11 USC § 544(b) and § 550, the transfers in the amount of $2,149,547.64 and the execution and delivery of the Change Order Agreement are avoidable by Debtor as trustee.

239. During the ninety day period prior the filing date the Change Order Agreement was executed by Sciame.

240. The Change Order Agreement allegedly resolved outstanding claims between the Debtor and Sciame and Cooper Union for less than full value.

## SCIAME IS THE AUTHORIZED AGENT OF COOPER UNION

241. Upon information and belief, the Sciame Cooper Union Contract is a construction management or agency contract.

242.     Upon information and belief, Sciame was the construction manager and agent of Cooper Union for the Cooper Union Project.

243.     Upon information and belief, Jonathan Rose was an agent of Cooper Union for the Cooper Union Project.

244.     Upon information and belief, Cooper Union approved directly or indirectly of all acts, practices, omissions and misrepresentations of Sciame as described herein.

245.     Upon information and belief, Cooper Union approved directly or indirectly of all acts, practices, omissions and misrepresentations of Jonathan Rose described herein.

## FIRST CLAIM FOR RELIEF
## FRAUDELENT TRANSFERS

246.     Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-245 though set forth in full herein.

247.     Debtor received less than a reasonably equivalent value in exchange for the transfers to or for the benefit of Sciame and the Change Order Agreement, including the purported releases contained therein.

248.     During the time that the transfers were made and the Change Order Agreement, including the purported releases contained therein, was executed and delivered, the Debtor was insolvent or became insolvent as a result of those transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein.

249. The transfers were made and the Change Order Agreement, including the purported releases contained therein was executed and delivered while the Debtor was engaged in business for which its remaining property was an unreasonably small capital.

250. At the time of the transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, the Debtor was unable to pay its debts as they became due.

251. The transfers were made and the Change Order Agreement, including the purported releases contained therein, was executed and delivered at a time when Sciame believed that the Debtor would incur debts that would be beyond the Debtor's ability to pay as such debts matured.

252. For the reasons set forth above, the transfers in the amount of $2,149,547.64 and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, are avoidable as fraudulent conveyances pursuant to 11 USC §541(a) (1) (b) and § 550.

## SECOND CLAIM FOR RELIEF
## FRAUDELENT TRANSFERS

253. Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-252 as though set forth in full herein.

254. At the time of the transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, the Debtor was insolvent or was

rendered insolvent by virtue of the transfers or the execution and delivery of the Change Order Agreement, including the purported releases contained therein.

255.    Sciame received the transfers and accepted the execution and delivery of the Change Order Agreement, including the purported releases contained therein, without consideration in constructive fraud of the Debtor's creditors.

256.    The transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, violated New York Debtor Creditor Law, including without limitation Article 10 - Fraudulent Conveyances.

257.    Pursuant to 11 USC § 544(b) and § 550, the transfers in the amount of $2,149,547.64 and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, are avoidable by Debtor as trustee.

**THIRD CLAIM FOR RELIEF**
**AVOIDABLE TRANSFERS – PREFERENCE**

258.    Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-257 as though set forth in full herein.

259.    At the time of the aforesaid transfers to Sciame the execution and delivery of the Change Order Agreement, including the purported releases contained therein, Sciame was a creditor of the Debtor. The transfers the execution and delivery of the Change Order Agreement, including the purported releases contained therein, were made for or on account of an antecedent debt owed by the Debtor before the transfers were made.

260.    The transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, were made while the Debtor was insolvent.

261.    The transfers and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, enabled Sciame to receive more than the Sciame would receive under Chapter 7 of Title 11 if the transfers had not been made.

262.    Sciame received payment of such debts to the extent provided by the provisions of Title 11.

263.    For the reasons set forth above, the transfers in the amount of $2,149,547.64 and the execution and delivery of the Change Order Agreement, including the purported releases contained therein, are avoidable as preferential payments pursuant to 11 USC § 547(b) and § 550.

## FOURTH CLAIM FOR RELIEF AGAINST SCIAME
## BREACH OF CONTRACT FOR NON PAYMENT
## AGAINST SCIAME AND COOPER UNION

264.    The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-263 as though set forth in full herein.

265.     Sciame failed to make payments as required pursuant to the express and implied terms of the Sciame Debtor Contract and Change Order Agreement.

266.     The non-payment constituted a material breach of the express and implied terms of the Sciame Debtor Contract and Change Order Agreement.

267.     The balance due under the Sciame Debtor Contract and Change Order Agreement $4,556,944.00.

268.     Debtor has demanded payment for the balance owed for labor, material and services tendered by the Debtor.

269.     The Debtor performed all its obligations under the Sciame Debtor Contract and the Change Order Agreement until Sciame.

270.     Sciame has refused to remit payment to the Debtor for the balance due and owing to the Debtor pursuant to the express and implied terms of the Sciame Debtor Contract and Change Order Agreement.

271.     As a result of Sciame's failure to pay the Debtor, the Debtor has suffered severe economic hardship.

272.     Sciame's failure to pay the Debtor constitutes a material breach of the express and implied terms of the Sciame Debtor Contract and Change Order Agreement and thereby frustrated the purpose of the Sciame Debtor Contract and Change Order Agreement.

273.     By reason of Sciame's material breach of the express and implied terms of the Sciame Debtor Contract and Change Order Agreement, the Debtor has been damaged in an amount in excess of $4,335,000 plus consequential damages, together with interest and attorneys' fees.

## FIFTH CLAIM FOR RELIEF AGAINST
## SCIAME AND COOPER UNION
## FOR BREACH OF CONTRACT
## MISREPRESENTATION AND BAD FAITH

274.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-273 as though set forth in full herein.

275.     The acts, practices, omissions and material misrepresentations of Sciame described above, constituted bad faith, a failure to deal fairly and a material breach by Sciame of the express and implied terms of the Sciame HVAC Contract.

276.     As a result of the Sciame's acts, practices, omissions and material misrepresentations described above, the Debtor suffered significant damages.

277. By reason of Sciame's bad faith, failure to deal fairly and material breach of the express and implied terms of the Sciame HVAC Contract, the Debtor has been damaged in an amount in excess of $4,556,944.00 plus consequential damages, together with interest and attorneys' fees.

### SIXTH CLAIM FOR RELIEF AGAINST SCIAME, COOPER UNION AND JONATHAN ROSE FOR BREACH OF DUTY TO INFORM OF BID MISTAKE

278. The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-277 as though set forth in full herein.

279. The acts, practices, omissions and material misrepresentations of Sciame described above, constituted a breach of its obligation to inform the Debtor of mistakes in its bid and a material breach by Sciame of the express and implied terms of the Sciame HVAC Contract.

280. As a result of the Sciame's acts, practices, omissions and material misrepresentations described above, the Debtor suffered significant damages.

281. By reason of Sciame's failure to inform the Debtor of a mistake in its bid and material breach of the express and implied terms of the Sciame HVAC Contract, the Debtor has been damaged in an amount in excess of $4,556,944.00 plus consequential damages, together with interest and attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF CONTRACT
## SIMS OVERCHARGING AND OVERBILLING

282.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-281 as though set forth in full herein.

283.     Sciame intentionally, repeatedly and knowingly allowed Sims to overcharge and overbill the Debtor under the Time and Material Contract and the Radiant Ceiling Contract.

284.     Sciame's conspiracy to allow Sims to overcharge and overbill the Debtor is a material breach of the Sciame Debtor Contract.

285.     As a result of foregoing, the Debtor has suffered severe economic hardship.

286.     The Debtor has demanded payment from Sciame.

287.     As a result of the breach of the Sciame Debtor Contract, the Debtor suffered damages in an amount of at least $1,159,840.41 plus consequential damages, together with interest and attorney's fees.

**EIGHTH CLAIM FOR RELIEF**
**AGAINST SCIAME AND COOPER UNION**
**FOR BREACH OF CONTRACT**
**ASSUMPTION OF SIMS TIME AND MATERIAL CONTRACT**

288.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-287as though set forth in full herein.

289.     Sciame intentionally and knowingly agreed with Sims to attorn to the Time and Material Contract.

290.     Sciame's agreement with Sims to attorn to the Time and Material Contract is a material breach of the Sciame Debtor Contract and tortious interference with the Time and Material Contract and Radiant Ceiling Contract.

291.     As a result of foregoing, the Debtor has suffered severe economic hardship.

292.     The Debtor has demanded payment from Sciame.

293.     As a result of the breach of the Sciame Debtor Contract, the Debtor suffered damages in an amount of at least $1,159,840.41 plus consequential damages, together with interest and attorney's fees.

**NINTH CLAIM FOR RELIEF
AGAINST SCIAME AND COOPER UNION
FOR VIOLATION OF AUTOMATIC STAY**

294.   Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-293 as though set forth in full herein.

295.   The acts, practices, omissions, and material misrepresentations described above, constitute a violation of the Automatic Stay.

296.   As a result of the violation of the Automatic Stay, the Debtor has suffered damages in an amount of $1,159,840.41.

**TENTH CLAIM FOR RELIEF
AGAINST SCIAME AND COOPER UNION
FOR FRAUD AND MISREPRESENTATION**

297.   The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-296 though set forth in full herein.

298.   By the acts, practices, omissions, and material misrepresentations described above, the Defendant deceived the Debtor and fraudulently induced the Debtor to enter into the Sciame Debtor Contract and the Change Order Agreement.

299.   In order to induce the Debtor into to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract, Sciame continuously represented to the Debtor that

the Debtor's was not the lowest bidder on the Cooper Union Project for the HVAC work and that the Debtor's bid was comparable to other qualified contractors.

300.    At the time(s) Sciame and its representatives, employees and officers advised the Debtor that it was not the lowest bidder for the HVAC work for the Cooper Union Contract and that the Debtor' bid was comparable to other qualified contractors, Sciame knew those statements and representations to be false.

301.    Upon information and belief, the representations made by Sciame to induce the Debtor to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract were false at the time that they were made, and defendant Sciame intentionally made such representations knowing that they were false.

302.    The Debtor repeatedly questioned Sciame and its representatives, employees and officers regarding the amount of the Debtor's bid.  Subsequently, the Debtor learned that their bid was in fact over $2 million less than the other qualified contractors who submitted bids on the HVAC work at the Cooper Union Project.

303.    Sciame and its representatives, employees and officers intentionally provided the Debtor with false information regarding the Debtor's bid in order to induce the Debtor into working on the Cooper Union Project.

304.    The Debtor reasonably relied upon the representations made by Sciame and its representatives, employees and officers regarding the accuracy of the Debtor's bid and whether the Debtor's bid was comparable to other qualified contractors.

305.    The Debtor continually requested information from Sciame regarding the size of its bid and the accuracy of its bid.  Sciame continuously advised the Debtor that it was not the low bid on the project and that their bid was comparable to other qualified contractors.

306.    As a result of Sciame's false representations, the Debtor commenced work under the Letter of Intent and entered into the Sciame Debtor Contract.

307.    As a result the acts, practices, omissions, and material misrepresentations described above constituting deception and fraudulent inducement of the Debtor to commence work under the Letter of Intent and enter into the Sciame Debtor Contract, the Debtor suffered significant damages.

308.    Upon information and belief, Sciame's actual intent was to have the Debtor enter into the Sciame Debtor Contract for an amount over $2 million less than other qualified contractors in order to meet budget figures provided by Sciame to Jonathan Rose and Cooper Union.

309. The statements made to the Debtor by Sciame were material representations which were relied upon by the Debtor to its detriment.

310. As a remedy for fraud and misrepresentation, the Debtor is entitled to rescission of the Contract and payment of its actual damages in a sum no less than $4,556,944.00.

311. Further, as a remedy for fraud and misrepresentation, the Debtor is entitled to the rescission of any pre-petition or post-petition agreement signed by and between the Debtor and the defendants in this matter that arose from the Cooper Union Project.

312. In addition, the Debtor is entitled to punitive damages in the sum of $10, 000, 0000.00

## ELEVENTH CLAIM FOR RELIEF FOR FRAUD AND DECEPTION AGAINST SCIAME, COOPER UNION AND JONATHAN ROSE

313. Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-312 as though set forth in full herein.

314. By the acts, practices, omissions, and material misrepresentations Cooper Union directly or by or through its agents Jonathan Rose and Sciame described above, Cooper

Union deceived the Debtor and fraudulently induced the Debtor to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract.

315. As a result the acts, practices, omissions and material misrepresentations described above constituting deception and fraudulent inducement of the Debtor by Cooper Union directly or by or through its agents Jonathan Rose and Sciame to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract, the Debtor suffered significant damages.

316. At the time(s) the Defendant and its representatives, employees and officers deceived the Debtor and fraudulently induced the Debtor to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract, Cooper Union knew directly or by or through its agents Jonathan Rose or Cooper Union that these statements and representations to be false.

317. Upon information and belief, the representations made by Cooper Union directly or by or through its agents Jonathan Rose and Sciame, to induce the Debtor to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract were false at the time that they were made.

318. Cooper Union directly or by or through its agents Jonathan Rose and Sciame intentionally made such representations knowing they were false.

319.     As a result of the acts, practices, omissions, and material misrepresentations described above constituting deception and fraudulent inducement of the Debtor to commence work under the Letter of Intent and to enter into the Sciame Debtor Contract, the Debtor is entitled to damages from Cooper Union in an amount equal to at least $4,556,944.00.

## TWELVETH CLAIM FOR RELIEF
## AGAINST SCIAME AND COOPER UNION
## FOR UNJUST ENRICHMENT

320.     Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-319 as though set forth in full herein.

321.     By the acts, practices, omissions, and misrepresentations described above, Sciame and Cooper Union unjustly enriched themselves against equity and good conscience.

322.     At the specific request of Sciame and Cooper Union, the Debtor performed work and furnished labor and materials to the Cooper Union Project for which it has not been paid.

323.     The fair value for the work performed by the Debtor and the labor and materials furnished by the Debtor to the Cooper Union Project for which it has not been paid is in the sum of at least $4,355,000.

324.     Despite due demand having been made, Sciame and Cooper Union have failed and refused to pay the Debtor any part of the outstanding balance due which is the sum of at least $4,355,000.

325.     As a result of the acts, practices, omissions and material misrepresentations of Sciame and Cooper Union described above, the Debtor suffered significant damages.

326.     It would be inequitable, unjust and contrary to good conscience to permit Sciame and Cooper Union to retain the economic benefits obtained as a result of the Sciame and Cooper Union acts, practices, omissions and material misrepresentations detailed herein.

327.     As a remedy for such unjust enrichment, the Debtor is entitled to damages in an amount equal to $4,556,944.00 plus consequential damages, together with interest and attorney's fees.

## THIRTEENTH CLAIM FOR RELIEF
### AGAINST SCIAME AND COOPER UNION FOR QUANTUM MERUIT

328.     Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-327 as though set forth in full herein.

329.     At the specific request of Sciame and Cooper Union, the Debtor performed work and furnished labor and materials to the Cooper Union Project for which it has not been paid.

330.     The fair value for the work performed by the Debtor and the labor and materials furnished by the Debtor to the Project for which it has not been paid is in the sum of at least $4,556,944.00.

331.     Despite due demand having been made, Sciame, Jonathan Rose and Cooper Union have failed and refused to pay the Debtor any part of the outstanding balance due which is the sum of at least $4,556,944.00 plus.


## FOURTEENTH CLAIM FOR RELIEF
## AGAINST SCIAME AND COOPER UNION FOR BREACH OF LIEN LAW


332.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-331 as though set forth in full herein.


333.     As of the date of the termination, Sciame, Jonathon Rose, and Cooper Union were holding contract funds in the sum of at least $2,000,000 ("Contract Balance").


334.     Upon information and belief, Sciame or Cooper Union received proceeds from the Sub Guard Policy.


335.     Upon information and belief, the proceeds received from the Sub Guard policy are trust funds.


336.     Pursuant to the Lien Law of the State of New York, the Contract Balance and the Sub Guard Policy proceeds constituted a trust fund within the meaning of Article 3-A of the Lien Law.

337.     Pursuant to Article 3-A of the Lien Law, Sciame and Cooper Union were and are trustees of said trust funds and have a fiduciary responsibility to ensure that the trust assets are distributed as prescribed by law.

338.     As a result of its status as a trust beneficiary, the Debtor hereby seeks to compel an accounting by Sciame and Cooper Union of all trust assets in its possession on and subsequent to January 1, 2009.

339.     In addition, pursuant to Article 3-A of the Lien Law, the Debtor is entitled to an order directing the trustee to make payment of the trust funds to the Debtor.

## FIFTEENTH CLAIM FOR RELIEF
## AGAINST SCIAME AND COOPER UNION FOR BREACH OF LIEN LAW

340.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-339 as though set forth in full herein.

341.     Upon information and belief, Sciame and Cooper Union have transferred or paid out trust funds for purposes other than the payment of trust fund beneficiaries.

342.     The payment of trust funds (including the Contract Balance and the Sub Guard Policy proceeds hereinabove mentioned and change order monies) for purposes other than payment to

trust fund beneficiaries constitutes a diversion of trust assets prohibited under Article 3-A of the Lien Law of the State of New York.


**SIXTEENTH CLAIM FOR RELIEF**
**AGAINST SCIAME AND COOPER UNION FOR CONVERSION**


343.    The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-342 as though set forth in full herein.


344.    Upon information and belief, Sciame and Cooper Union have used the Contract Balance and Sub Guard proceeds for purposes other than the payment of its obligations to the Debtor.


345.    By using the Contract Balance and Sub Guard Policy proceeds for purposes other than the payment of its obligation to the Debtor, Sciame and Cooper Union have converted and are guilty of converting the Contract Balance, Sub Guard Policy proceeds and Change Order Agreement proceeds for improper purposes.


346.    As a result of Sciame and Cooper Union's conversion of the Contract Balance, Sub Guard Policy proceeds and Change Order Agreement proceeds, the Debtor has sustained damages in an amount of no less than $4,556,944.

**SEVENTEENTH CLAIM FOR RELIEF
AGAINST SCIAME AND COOPER UNION
FOR FORECLOSURE OF DEBTOR'S LIEN
AND AGAINST THE FIDELITY BOND**

347.     The Debtor refers to and incorporates each and every allegation contained in the foregoing paragraphs 1-346 as though set forth in full herein.

348.     Sciame as principal and Fidelity as surety issued the Bond, which obligates Fidelity to pay any judgment which may be rendered in the action against the property for the enforcement of the Debtor's Lien, not exceeding the sum of Three Million Six Hundred Twenty Two Thousand Three Hundred One & 65/100 ($3,622,301.65) Dollars.

349.     The Bond discharged the Debtor's Lien.

350.     As described above, the Debtor has sought judgment against Sciame in an amount of 4,335,000.

351.     Based upon the foregoing, the Debtor is entitled to recover judgment against Fidelity by virtue of its undertaking given to discharge the above lien in the sum of $3,622,301.645 plus interest.

352.     By reason of the foregoing, Fidelity is liable to the Debtor in an amount not to exceed 3,622,301.65, no part of which has been paid, despite due demand thereof.

**WHEREFORE,** Debtor prays for judgment against the Defendants as follows:

**On the First Claim, Second Claim and Third Claim against Sciame and Cooper Union for:**

(A)     Avoiding the transfers made to or for the benefit of Sciame and Cooper Union pursuant to the invoices and requisitions described above during the ninety day period prior to the Bankruptcy Filing in the amount of $1,037,225.02;

(B)     Avoiding the transfers made to or for the benefit of Sciame and Cooper Union pursuant to the Change Order Agreement during the ninety day period prior to the Bankruptcy Filing in the amount of $1,112,372.62;

(C)     Voiding the Change Order Agreement;

(D)     Reasonable Attorney's fees and all costs of this action; and

(E)     Such other and further relief as the Court deems just and proper.

**On the Fourth Claim and Fifth Claim against Sciame and Cooper Union for:**

(A)     Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)      Reasonable Attorney's fees and all costs of this action; and

(C)     Such other and further relief as the Court deems just and proper.

**On the Sixth Claim against Sciame, Cooper Union and Jonathan Rose for:**

(A) Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B) Reasonable Attorney's fees and all costs of this action; and

(C) Such other and further relief as the Court deems just and proper.

**On the Seventh Claim and Eighth Claim against Sciame and Cooper Union for:**

(A)     Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)     Reasonable Attorney's fees and all costs of this action;

(C)      Exemplary and punitive damages; and

(D)     Such other and further relief as the Court deems just and proper.

**On the Ninth Claim against Sciame and Cooper Union for:**

(A)      Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)      Reasonable Attorney's fees and all costs of this action; and

(C)      Such other and further relief as the Court deems just and proper.

**On the Tenth Claim against Sciame and Cooper Union for:**

(A)      Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)      Reasonable Attorney's fees and all costs of this action;

(C)      Exemplary and punitive damages; and

(D)     Such other and further relief as the Court deems just and proper.

**On the Eleventh Claim against Sciame, Cooper Union and Jonathan Rose for:**

(A)      Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)      Reasonable Attorney's fees and all costs of this action;

(C)      Exemplary and punitive damages; and

(D)     Such other and further relief as the Court deems just and proper.

**On the Twelfth Claim against Sciame and Cooper Union for:**

(A)      Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)      Reasonable Attorney's fees and all costs of this action;

(C)      Exemplary and punitive damages; and

(D)     Such other and further relief as the Court deems just and proper.

**On the Thirteenth Claim against Sciame and Cooper Union for:**

(A)     Actual damages in excess of $75,000.00, plus interest thereon as allowed by law;

(B)     Reasonable Attorney's fees and all costs of this action; and

(C)     Such other and further relief as the Court deems just and proper.

**On the Fourteenth, Claim Fifteenth Claim and Sixteenth Claim against Sciame and Cooper Union for:**

(A)     Adjusting the determining the equities of all the parties to this action and determining the validity, extent and priority of each and all of the liens and claims which may be presented and asserted herein.

(B)     That Sciame and Cooper Union be directed to render to the Debtor a just and full verified account of the monies received and disbursed by them in connection with each separate trust referred to in this complaint as to the Cooper Union Project for the period from November 1, 2006 to date, in the matter and form as is required pursuant to Article 3A of the Lien Law of the State of New York.

(C)     That this Court determine and declare that the monies, property and assets of Sciame and Cooper Union, are trust funds held for the benefit of the Debtor and the persons it represents to the extent that such funds and assets are shown to have been trust funds as described in the Complaint or traced to diversions of such trust funds.

(D)     That this Court set aside as a diversion any payments, assignments or other transfer, whether voluntary or involuntary, from the trust fund referred to in the Complaint which are not proper disbursements of trust funds from such trust fund.

59

(E)     That this Court enjoin Sciame and Cooper Union during the PENDENCY of this action and permanently from making any diversion of said trust fund not authorized pursuant to the provisions of Article 3A of the Lien Law of the State of New York or other applicable provisions of law.

(F)     That the Debtor recover damages from these defendants for their breach of trust obligations in taking monies from the said trust for themselves and for making and consenting to diversions of said trust funds to persons, firms or corporations not authorized to receive the proceeds of said trust funds.

(G)     That the Court determine the existence and amount of any trust assets or any trust claims which may be shown in the account of Sciame and Cooper Union to be directed by the Court.

(H)     That this Court grant an order terminating and limiting the authority of Sciame and Cooper Union in the application of the trust assets of any trust assets and directing the time and manner of application of the trust asset of a party thereof.

(I)     That, if necessary during the PENDENCY of this action, the Court order have Sciame and Cooper Union give security to insure the proper distribution of the trust assets, either during the pendency of this action or thereafter or to furnish other assurance if any becomes necessary.

(J)     That the Court grant an order of distribution of any trust assets available for distribution with respect to particular assets of the trust or for retention of particular assets for future distributions.

(K)     That the interim account and final account of the defendants, as Trustees, be settled as to the respective trusts.

(L)     That any provision of ancillary relief incidental to any of the relief sought herein be granted by this Court.

(M)     Reasonable Attorney's fees and all costs of this action; and

(N)     Such other and further relief as the Court deems just and proper.

**On the Seventeenth Claim against Fidelity for:**

(A)     Adjusting the determining the equities of all the parties to this action and determining the validity, extent and priority of each and all of the liens and claims which may be presented and asserted herein.

(B)     Adjudging that the Debtor, by filing and causing the docketing of Debtor's Lien as aforesaid, acquired a good and valid lien upon the interests of Sciame and Cooper Union, in the Premises hereinabove described, in the sum of $3,622,301.65, together with interest thereon from August 13, 2009 and the costs and disbursements of this action;

(C)     That Sciame and Cooper and all persons claiming by, through or under them, or any of them, be forever foreclosed of all equity of redemption or other lien, claim or interest and into said property.

(D)     That a judgment be rendered in form only against the real property hereinabove described.

(E)     That Fidelity, as surety on the Bond, be adjudged liable to the Debtor for the amount of its said lien, with interest and the costs and disbursements of this action, and that the Debtor recover judgment against Fidelity therefor.

(F)     Reasonable attorney's fees and all costs of this action; and

(G)     Such other and further relief as the Court deems just and proper.

Dated: March 22, 2010
White Plains, New York

**KEVIN G. MCMORROW**


By: /s/ Kevin G. McMorrow
Kevin G. McMorrow
Special Construction Counsel for
Richards Conditioning Corp.
45 Hill Park Avenue
Great Neck, New York 11021
(516)426-8877

**PENACHIO MALARA LLP**

By: /s/ Anne Penachio
Anne Penachio
Attorney's for Richards Conditioning Corp.
235 Main Street, Suite 600A
White Plains, NY 10601
(914)946-2889